# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 12-3264

## CARROL DURRELL, PARENT AND
## EDUCATIONAL DECISION MAKER FOR S.H., AND S.H.,
Plaintiff-Appellants,

v.

## LOWER MERION SCHOOL DISTRICT,
Defendant-Appellee

## APPEAL FROM THE UNITED STATES DISTRICT COURT OF
## THE EASTERN DISTRICT OF PENNSYLVANIA

## REPLY BRIEF OF APPELLANTS,
## CARROL DURRELL, PARENT AND EDUCATIONAL DECISION
## MAKER FOR S.H., AND S.H.

Sonja D. Kerr
Pa. Bar No. 95137
Benjamin D. Geffen
Pa. Bar No. 310134
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway, 2nd Floor
Philadelphia, PA 19130
Telephone:(215) 627-7100
Fax:(215) 627-3183
Email:skerr@pilcop.org
bgeffen@pilcop.org

Attorneys for Appellants Durrell and S.H.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................iii

INTRODUCTION ...........................................................................1

ARGUMENT .................................................................................4

   I.   S.H. HAS A CLAIM PURSUANT TO THE IDEA ............................4

       A. The IDEA Outlaws Misidentification of African-American
          Children as Children with Disabilities .......................................4

       B. "Child Find" Applies to Misidentification Claims ........................8

       C. Specially Trained Hearing Officers Should Review Child
          Find/Overidentification Claims and Award Appropriate Remedies9

   II.   APPELLANTS ARE ENTITLED TO A JURY TRIAL ON THEIR
       "REGARDED AS" CLAIM ....................................................16

       A. Requiring Intentionality Remains Inconsistent with Third Circuit
          Decisions About Section 504 and the ADA...............................17

       B. The Facts and Circumstances Under Which LMSD Wrongly
          Regarded S.H. As Disabled Should be Considered
          by a Jury....................................................................19

       C. S.H. Produced Sufficient Evidence for a Jury to Infer That LMSD
          Acted with Deliberate Indifference .......................................20

          1. S.H. Raised a Genuine Issue of Material Facts About Her
             Placement Into Title I Classes...........................................21

          2. The Trial Court Acknowledged S.H. Has Raised a Genuine
             Issue of Material Fact as to Whether LMSD Had Misidentified
             S.H. ............................................................................22

          3. The Trial Court Acknowledged that S.H. Had Raised a Genuine
             Issue of Material Fact As to Whether the District was

Cooperative with Initial Attempts to Remove S.H. from Special
Education and Its Psychologists Lied to the Family ............... 26

4.  S.H. Raised a Genuine Issue of Material Fact About Course
Selection and the GPA Policy .................................................. 27

CONCLUSION ........................................................................................ 29

CERTIFICATE OF COMPLIANCE ..................................................... 30

CERTIFICATE OF BAR MEMBERSHIP ............................................ 31

CERTIFICATE OF SERVICE................................................................ 32

# TABLE OF AUTHORITIES

## Cases

*A.W. v. Jersey City Pub. Sch.,* 486 F.3d 791(3d Cir. 2007) ...................................... 18

*Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999) ....................................................... 26

*Alexander v. Choate*, 469 U.S. 287 (1985) ........................................................ 17, 18

*Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047 (9th Cir. 2012) ................................ 14

*Barnes v. Gorman*, 536 U.S. 181 (2002) ................................................................. 18

*Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749 (E.D. Pa. 2011) .................................................................................................................... 5, 7

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008) .............................. 20

*Brown ex rel. R.P. v. Sch. Dist. of Phila.*, No. 11-cv-6019, 2012 U.S. Dist. LEXIS 104855 (E.D. Pa. July 26, 2012). ..................................................... 17

*C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159 (3d Cir. 2005) .............................. 16

*Compton Unified School District v. Addison*, 598 F.3d 1181(9th Cir. 2010) ............................................................................................................... 10

*D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488 (3d Cir. 2012) ............................................................................................................... 11

*Dep't of Educ. v. M.F.*, 840 F. Supp. 2d 1214 (D. Haw. 2011) .............................. 13

*Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712 (3d Cir. 2010) .............................. 11

*Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230 (2009) ........................................... 10

*J.P. v. Anchorage Sch. Dist.*, 260 P.3d 285 (Alaska 2011) ..................................... 8

*Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481 (7th Cir. 2012) ............................. 8

*Lee v. Lee Cnty. Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007)............. 6, 23

*Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990) ................................... 11

*M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389 (3d Cir. 1996)................. 12

*Nathanson v. Med. Coll.*, 926 F.2d 1368 (3d Cir. 1991)......................... 17

*P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009)......................... 17

*Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238 (3d Cir. 1999) .............................. 17

*Ridley Sch. Dist. v. M.R.*, 680 F.3d 260 (3d Cir. 2012)............................................. 6

*Taylor v. Altoona Area Sch. Dist.*, 737 F. Supp. 2d 474 (W.D. Pa. 2010).................................................................................................. 17

*Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007) .................................. 14

*Zobrest v. California*, 509 U.S. 1 (1993) ................................................................ 10

## Statutes

20 U.S.C. § 1400(c)(12) .................................................................................... 23

20 U.S.C. § 1412(a)(1)(A ................................................................................... 11

20 U.S.C. § 1412(a)(24) .............................................................................. 1, 4, 23

20 U.S.C. § 1412(a)(3)(A)..................................................................................... 8

20 U.S.C. § 1414(a)(1)(D)(i)(I)........................................................................... 13

20 U.S.C. § 1414(a)(1)(D)(i)(II) ......................................................................... 13

20 U.S.C. § 1414(c)(3) ...................................................................................... 13

20 U.S.C. § 1415 ................................................................................................. 9

20 U.S.C. § 1415(b)(6)(A) ................................................................................. 10

20 U.S.C. § 1416(a) ................................................................. 5

20 U.S.C. § 1418(b) ................................................................. 23

## Rules

34 C.F.R. § 300.173 ................................................................. 4

34 C.F.R. § 300.9 ................................................................... 13

34 C.F.R. § 300.500(b)(1) (1999) .......................................... 13

34 C.F.R. § 300.600(d)(3) ......................................................... 4

## Agency Opinions

*Memorandum to State Directors of Special Education*, 48 IDELR 193
    (OSEP Apr. 24, 2007) ................................................. 6, 7, 24

*Questions and Answers on Disproportionality,* 52 IDELR 267 (OSEP
    June 1, 2009) ............................................................... 7

## Articles

Robert A. Garda, Jr., *The New Idea: Shifting Educational Paradigms
    to Achieve Racial Equality in Special Education*, 56 Ala. L. Rev.
    1071 (2005) ...................................................................... 5

Sarah Redfield and Theresa Kraft, *What Color is Special Education?*,
    41 J.L. & Educ. 129 (2012) ............................................. 5

## INTRODUCTION

Appellee Lower Merion School District ("LMSD") asserts many facts and twisted arguments but cannot avoid the reality that S.H. is not a child with a disability and never was, although LMSD regarded her as having a Specific Learning Disability for years. Indeed, after she was finally allowed to escape special education in tenth grade, S.H. was able to complete some Honors courses and graduate from high school in LMSD. App. 910; 692.

The Individuals with Disabilities Education Act ("IDEA") requires states to put in place "policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities," 20 U.S.C. § 1412(a)(24), but LMSD contends it has no duties toward S.H. under that statute. LMSD's primary factual defense is essentially that it is Ms. Durrell's "fault" that S.H. was misidentified as a child with a disability. LMSD argues that it uses a "team process" that includes parents whereby multiple criteria are used to determine a child's functioning and need. Meetings were held, but clearly Ms. Durrell was not informed about and did not know the criteria for placement of S.H. in Title I, App. 975; 1005; 1223, or special education, App. 976-80; 1006-13. The "parent did it" defense is wholly without merit when, as here, the parent was not fully informed: the IDEA does not require a parent to automatically know special education identification criteria, and

1

Ms. Durrell understandably "trusted" LMSD staff, App. 978-979, *see also* App. 1014-15.

Notably, LMSD has conceded that after spending nearly five years in Title I remedial reading, S.H. still showed average academic skills in all areas when tested in 2003. App. 952, App. 1029. Ms. Durrell was not aware of this and would not have allowed her to be put in special education if she had understood it. App. 978. In January, 2005, midway through her fifth grade year, and after being in special education, S.H. was able to read at above grade level. App. 1240-46; 990-92; 1001. Ms. Durrell did not recall whether anyone from LMSD had told her they had done this test at that time. App. 980.

LMSD also conveniently ignores S.H.'s repeated resistance to special education in the face of LMSD's insistence that she was a student with a disability. When tested in fifth grade, S.H. told Ms. Cucinotta she did not want to go into special education. App. 950. In middle school, where she was deprived of attending science and social studies like her nondisabled peers, S.H. asked her teachers how to "get out" of special education. App. 928; 937. Ms. Durrell requested S.H. be removed from special education in eighth grade and again in high school. App. 453. In high school, S.H. refused to attend speech therapy, and Ms. Durrell removed her from speech and language services. App. 983-85. Ms. Durrell asked that she be excluded from ISL classes as of November 2, 2009, and

requested an Independent Educational Evaluation on November 19, 2009. App. 1246.3; 935-36.

In January 2010, Independent Educational Evaluator Dr. Umar Abdullah-Johnson concluded that S.H. had average intelligence and average academics, and that LMSD's identification of S.H. as learning disabled was and always had been erroneous. App. 1029. Dr. Cosden had issued a report that S.H. had a Specific Learning Disability, and Abdullah-Johnson disagreed with this. App. 993.

S.H. was not formally exited from special education until April 2010, the spring of her tenth-grade year. App. 452-453, 694. Despite the exiting, LMSD's expert witness before the Trial Court claimed S.H. has a Specific Learning Disability. App. 1347.

Whether S.H. has a learning disability, or ever did, is a key and genuine issue of fact in this case. If, as LMSD claims, S.H. had a Specific Learning Disability, then no misidentification occurred and hence no discrimination. But if, as S.H. contends, she was a minority student misidentified as a "child with a disability" contrary to the IDEA, then LMSD violated the IDEA's statutory requirements. The facts and circumstances underlying LMSD's continued insistence—even to the Trial Court—that S.H. is disabled is a matter for the jury to decide, since determinations of this type of disability are clearly a matter of some discretion by LMSD psychologists, and since S.H. produced ample expert and fact

3

opinion to the contrary. Such discretion is clearly an issue of credibility and inference for the jury.

## ARGUMENT

## I.    S.H. HAS A CLAIM PURSUANT TO THE IDEA.

### A. The IDEA Outlaws Misidentification of African-American Children as Children with Disabilities.

LMSD argues that in creating the IDEA, Congress did not intend to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, and that even if Congress did, S.H. has to prove racial bias to prevail on her IDEA claim. Appellee's Brief at 20-25. Congress did intend to prevent misidentification of African-American students as children with disabilities if they did not have disabilities and S.H. does not have to prove anything other than that LMSD was wrong.

The IDEA specifically requires:

(24) Overidentification and Disproportionality. The State has in effect, consistent with the purposes of this chapter and with section 1418 (d) of this title, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity *of children as children with disabilities*, including children with disabilities with a particular impairment described in section 1401 of this title.

20 U.S.C. § 1412(a)(24) (emphasis added); *accord* 34 C.F.R. § 300.173. In addition, 34 C.F.R. § 300.600(d)(3) requires that the State of Pennsylvania monitor local educational agencies to measure performance in the "disproportionate

4

representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification." *See also* 20 U.S.C. § 1416(a). In carrying out this monitoring requirement, the Commonwealth of Pennsylvania concluded in 2005 that LMSD had a disproportionate representation of African-American students in special education. *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749, 757 (E.D. Pa. 2011). The State did not look further as to whether the representation was the "result of inappropriate identification." But clearly, the IDEA explicitly forbids inappropriate identification of minority *children as children with disabilities*.

In "*What Color is Special Education?*", Sarah Redfield and Theresa Kraft, 41 J.L. & Educ. 129 (2012), the authors traced repeated national studies that have concluded African-American children have been overidentified as having disabilities and incorrectly placed in special education, as well as Congress's reaction to that problem from the beginning of the IDEA to the most recent revision in 2004. Notably, two years after S.H. was wrongly designated as having a disability, Robert A. Garda, Jr., *The New Idea: Shifting Educational Paradigms to Achieve Racial Equality in Special Education*, 56 Ala. L. Rev. 1071 (2005), succinctly explained the problem:

> Since the landmark decision of *Brown v. Board of Education* mandated desegregation in public schools, African-American students have been resegregated within public schools through their over-placement in special education classes. . . . African-American students are identified

as disabled under the IDEA in numbers that so exceed their proportion in the general population that the Department of Education considers it a "national problem" and experts proclaim it a "crisis."

The United States Department of Education's Office of Special Education Programs ("OSEP") has repeatedly clarified that disproportionality and misidentification relate to the "identification of *children as children with disabilities.*" *Memorandum to State Directors of Special Education*, 48 IDELR 193 (OSEP Apr. 24, 2007) (emphasis added).[1]

Consistent with the statute, the interpretations by OSEP, and common sense, in *Lee v. Lee County Board of Education*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007), the court approved termination of a longstanding education desegregation case against the State, noting that the state officials had demonstrated they understood the need to continue to address racial disproportionality in special education; in doing so, the Court noted:

> that the [IDEA] contains provisions designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of *children as children with disabilities* and data concerning disproportionality in special education will be reported to the federal government.

---

[1] Courts owe deference to OSEP's interpretations of IDEA regulations. *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 276 (3d Cir. 2012).

*Id.* at 1364-65 (citations omitted) (emphasis added). There is no question that the IDEA is designed to address the issue of overidentification of children as children with disabilities.

It is undisputed that during S.H.'s tenure in the District, in 2005, the Pennsylvania Department of Education found that there was a disproportionate number of African-American students in special education programs in Lower Merion. *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749, 757 (E.D. Pa. 2011). LMSD claims this was not true or if it is true, this was disproportionality and not over-identification, Appellee's Br. at 36, but the finding in *Blunt* speaks for itself.

That is not the end of the story, however. As the United States Department of Education has pointed out in letters to the field, the next step is that LMSD was required to examine its policies, practices, and procedures to determine whether any changes were required to prevent *inappropriate identification. Questions and Answers on Disproportionality,* 52 IDELR 267 (OSEP June 1, 2009); *Memorandum to State Directors of Special Education*, 48 IDELR 193 (OSEP Apr. 24, 2007). Each time, the United States Department of Education has explained that if a state determines significant disproportionality based on race and ethnicity is occurring in a particular district with respect to "identification of children as children with disabilities," then the district must review and, if appropriate, revise

its policies, procedures, or practices, and publicly report those revisions. Rather than revising its identification policies, LMSD has opted to defend them in court.

### B. "Child Find" Applies to Misidentification Claims.

The IDEA's so-called "Child Find" provision requires that all children residing in a State be "identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A). School districts are responsible to determine who has a disability and who does not. In *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 486 (7th Cir. 2012), the court held that the IDEA's "Child Find" requirement is extremely fact-specific. Because of the fact-specific nature of the inquiry, the court in *Jamie S.* found that causes of action relating to "Child Find" cannot be brought in the form of a class-action lawsuit. *Id.* Thus, if claims about identification are to be resolved, they should be resolved at the administrative hearing level.

This must be true for children who are not actually disabled as well as those whom a hearing officer finds to be disabled. Children who are not actually disabled are entitled to the protection of the IDEA when the dispute concerns whether they have a disability, and the IDEA does not make a distinction about the outcome—disabled or not disabled. *J.P. v. Anchorage School District*, 260 P.3d 285 (Alaska 2011) involved a Native Alaskan child who had sought an evaluation. Ultimately, the parent obtained a private evaluation. Although the district accepted the evaluation, the district concluded that child did not have a disability, and the child

never received special education services. A special education hearing officer carefully listened to the testimony and concluded that the child did not have a disability but awarded the child's parents reimbursement for a privately obtained evaluation because of the district's delay in evaluating the student. In affirming the hearing officer's award of reimbursement for the parent's private evaluation, the Alaska Supreme Court explained that because an evaluation is necessary to determine whether a child is disabled within the meaning of the IDEA, disability cannot logically be a prerequisite for the rights implied by the IDEA's "Child Find" requirement. *Id.* at 293. Thus, misidentification of a student must be a Child Find issue.

## C. Specially Trained Hearing Officers Should Review Child Find/Overidentification Claims and Award Appropriate Remedies.

LMSD offers no reason that hearing officers, like the one who listened to S.H.'s claim, should not hear Child Find overidentification cases. *See* Appellee's Brief at 26-29. Instead, LMSD contends that simply because Ms. Durrell went to meetings—without information—she received all the protections she needed. But S.H. and Ms. Durrell were denied the ultimate procedural right—the right to have this matter fully decided by a special education hearing officer, under the requirements of the IDEA, 20 U.S.C. § 1415. Nothing in the IDEA gives one legal basis for that refusal. Indeed, the statute and regulation both anticipate that "any matter" related to the "identification and evaluation of a child with a disability"

9

will be heard by a special education hearing officer.[2] In *Compton Unified School District v. Addison*, 598 F.3d 1181, 1184 (9th Cir. 2010), the court noted that a party can bring a complaint to a due process hearing regarding "'*any matter* relating to the identification, evaluation, or educational placement of the child.'" *Id.* (quoting 20 U.S.C. § 1415(b)(6)(A)). A minority child like S.H. who has been misidentified as a child with a disability should, therefore, be provided the opportunity for a fact specific determination consistent with the IDEA's "Child Find" requirements.

As OSEP and others have noted, Congress had the goal of prohibiting inappropriate overidentification or disproportionate representation by race and ethnicity of *children as children with disabilities*. The Court should find that S.H. fits squarely into the group Congress explicitly designed for protection, and it should reject LMSD's suggestion that S.H. cannot take advantage of the special education due process hearing system because she was wrongly identified as a child with a disability.

---

[2] For example, the United States Supreme Court has concluded that in situations where a child has a disability but does not even attend public school, the child is protected by the IDEA. *Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230 (2009) (IDEA may permit reimbursement for private-education expenses to student who never received special education services from public school); *Zobrest v. California*, 509 U.S. 1 (1993) (court had jurisdiction, without exhaustion, to protect rights of deaf student who sought interpreter in private school). So too should the IDEA protect a minority child who has been inaccurately deemed disabled.

While this Court has never addressed the availability of an IDEA remedy for a minority student who was misidentified as a child with a disability contrary to the IDEA and who managed to exit special education when the error is discovered, this Court has concluded that students identified as children with disabilities under the IDEA who later "age out" of special education or move are still entitled to remedies. In *Ferren C. v. School District of Philadelphia*, 612 F.3d 712, 719 (3d Cir. 2010), the Court held that it was "appropriate relief" under the IDEA to award compensatory education to a plaintiff who is not a child with a disability. To be sure, S.H. is not a "child with a disability" because she lacks a disability, while Ferren C. was not a "child with a disability" because she was twenty-four years old and therefore not a "child," *see* 20 U.S.C. § 1412(a)(1)(A). But *Ferren C.* recognized that even a plaintiff who is not a "child with a disability" and who thus has no entitlement to FAPE under the IDEA can nonetheless obtain relief under that statute. *See also Lester H. v. Gilhool*, 916 F.2d 865, 872 (3d Cir. 1990) (holding that IDEA plaintiff over 21 "has the right to ask for compensation because the School District violated his statutory rights while he was still entitled to them"). In another recent decision, this Court held that a claim under the IDEA "is not rendered moot by an out-of-district move, even if that move takes the child out of state." *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 497-98 (3d Cir. 2012); *see also id.* at 497 ("To comply with the IDEA, a school district no

longer responsible for educating a child must still be held responsible for its past transgressions. Were we to uphold the District Court's ruling, we would create an enormous loophole in that obligation and thereby substantially weaken the IDEA's protections."). A nondisabled minority child misidentified and misplaced through IDEA processes should be treated in a similar fashion.

Apart from arguing that the IDEA offers no relief to misidentified nondisabled children as a matter of law, LMSD's primary argument is that Ms. Durrell agreed with LMSD staff. But there is no evidence that Ms. Durrell understood the eligibility criteria and there is plenty of evidence that she did not, because while she may have "gone along," she did not provide "informed consent." This Court has instructed that

> [A] child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith. Rather, it is the responsibility of the child's teachers, therapists, and administrators—and of the multi-disciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly.

*M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). Here, LMSD failed to provide Ms. Durrell with even the rudiments of knowledge she would have needed to give truly informed consent to S.H.'s identification for special education.

LMSD points to various meetings held with and documents signed by Ms. Durrell as part of IDEA-mandated processes, *see* Appellee's Brief at 9-16, but it has not established and cannot establish that she provided *informed* consent. The concept of informed consent is deeply embedded in the IDEA's text, regulations, and caselaw. The text of the statute includes requirements that a district obtain parents' *informed* consent before conducting an initial evaluation, 20 U.S.C. § 1414(a)(1)(D)(i)(I), or a reevaluation, *id.* § 1414(c)(3), and before providing special education and related services, *id.* § 1414(a)(1)(D)(i)(II). The regulations state:

> Consent means that —
>
> (a) The parent has been fully informed of all information relevant to the activity for which consent is sought . . . ;
>
> (b) The parent understands and agrees in writing to the carrying out of the activity for which his or her consent is sought . . . ; and
>
> (c)(1) The parent understands that the granting of consent is voluntary on the part of the parent and may be revoked at any time. . . .

34 C.F.R. § 300.9.[3] "[T]he IDEA's mandate centers on the concept that parents be given proper notice so that their consent . . . and corresponding educational decisions are *informed* ones." *Dep't of Educ. v. M.F.*, 840 F. Supp. 2d 1214, 1230

---

[3] In the regulations in effect in the earliest years at issue in this case, the definition of "consent" appeared at 34 C.F.R. § 300.500(b)(1) (1999) and was for all relevant purposes identical to the current definition.

(D. Haw. 2011); *cf. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 531 (2007) ("IDEA, through its text and structure, creates in parents an independent stake not only in the procedures and costs implicated by this process but also in the substantive decisions to be made."); *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012) ("[T]he IDEA, its implementing regulations, and our case law all emphasize the importance of parental involvement and advocacy, even when the parents' preferences do not align with those of the educational agency.").

Here, the District failed to empower Ms. Durrell with the knowledge required for informed consent from the beginning of S.H.'s educational career and through and until the completion of the Independent Educational Evaluation ("IEE"). This absence of informed consent persisted throughout the years in question and impacted each of the areas that Appellants point to as evidencing discrimination.

**Title I: Lack of Informed Consent**. When LMSD placed S.H. into its Title I reading program, it characterized the program to Ms. Durrell as an "enrichment" program to provide an "extra boost." App. 1223; 975. Ms. Durrell believed this characterization of the Title I program and did not understand that Title I is a "remedial" program. App. 1223-24; *see also* App. 1005 (Ms. Durrell testifying that "I never recall a meeting or any informed consent of me saying that they could go into Title I.").

**Specific Learning Disability: Lack of Informed Consent**. In addition to not understanding Title I, Ms. Durrell was not informed about a "specific learning disability" and testified she never knew until years later, after the IEE, that S.H. had average IQ and average academics in fifth grade, and that if she had known that, she would not have agreed to have S.H. placed in special education. Durrell Deposition. App. 978.

**Middle School Lack of Science and Social Studies: Lack of Informed Consent**. In middle school, when S.H. was placed in special education, she was, as a result of that placement, denied the opportunity to participate in Social Studies in sixth and seventh grade, Spanish classes in seventh and eighth grade, and Science in eighth grade unlike her nondisabled peers. App. 1188; 923; 914-15; 937; 1041.

**High School Course Selection and GPA: Lack of Informed Consent**. In high school, S.H. was required to attend Speech Therapy and Instructional Support Lab ("ISL") and, as a consequence, was deprived of opportunities to achieve a high GPA because she could not take other core courses. Ms. Durrell did ask that S.H. be excused from ISL in 2009. App. 1246.3. Ms. Durrell did not know, nor did S.H. know, that by attending ISL classes, her GPA would necessarily be lower because LMSD did not count ISL grades toward a student's GPA. App. 1131-32. In fact, even the Assistant Superintendent Mike Kelly testified he was not aware of this

until he sat through the deposition of high school principal Hockfield. App. 1150-51.

In short, Ms. Durrell may have "gone along" but she did so out of "trust" not from informed consent; LMSD is, therefore, not permitted to rely upon her acquiescence as a defense.

## II.    APPELLANTS ARE ENTITLED TO A JURY TRIAL ON THEIR "REGARDED AS" CLAIM.

While conceding it regarded S.H. as having a disability and that it is subject to Section 504 of the Rehabilitation Act ("Section 504") and the Americans with Disabilities Act ("ADA"), LMSD contends that S.H. must prove "intentional discrimination," that she has failed to put forth any issues of genuine fact proving she was denied any "benefits" of the district, and that therefore she has no right to put her case before a jury. This is wrong. "Summary judgment may not be granted ... if there is a disagreement over what inferences can reasonably be drawn from the facts even if the facts are undisputed." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005) (quotation marks and citation omitted). Here, there is much disagreement over what a jury could infer from the facts. LMSD argues that even though it concededly placed S.H. into Title I, regarded S.H. as having a disability, excluded S.H. from Social Studies, Science and Spanish in middle school, and prevented her from achieving a higher GPA by placing her into non-GPA-credit special education classes, nevertheless no jury

could find it discriminated against S.H. by these facts and circumstances, because its staff was "right," and Ms. Durrell acquiesced. The law and the facts compel a different conclusion.

## A.    Requiring Intentionality Remains Inconsistent with Third Circuit Decisions About Section 504 and the ADA.

This Court has never specifically required intentionality in this type of case. Appellee Br. at 30-31. In *Nathanson v. Medical College*, 926 F.2d 1368 (3d Cir. 1991), the Court specifically rejected the requirement of intentional discrimination in the educational setting in reliance on the "benign neglect" standard from *Alexander v. Choate*, 469 U.S. 287 (1985). And the only Third Circuit case to address an intentionality requirement under Section 504 and the ADA in a public school setting remains *Ridgewood Board of Education v. N.E.*, 172 F.3d 238 (3d Cir. 1999), *superseded by statute on other grounds as recognized in P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009). The district courts are not in agreement. One decision from the Western District of Pennsylvania has held that "while a § 504 claim need not allege intentional discrimination, there is a question as to whether compensatory damages are recoverable where the discrimination was unintentional." *Taylor v. Altoona Area Sch. Dist.*, 737 F. Supp. 2d 474, 491 (W.D. Pa. 2010), while the Eastern District has assumed an intentionality requirement standard described as an "inference of deliberate indifference," *Brown ex rel. R.P. v. Sch. Dist. of Phila.*, No. 11-cv-6019, 2012 U.S.

Dist. LEXIS 104855, at *26 (E.D. Pa. July 26, 2012). Thus, while it is true that the

Supreme Court in *Barnes v. Gorman*, 536 U.S. 181 (2002), held that the remedies,

procedures, and rights of the ADA are the same as those from Title VI, *Barnes* did

not address explicitly the standard of intentionality under 504 and the ADA in a

school setting or a "regarded as" situation, and did not explicitly overrule

*Alexander v. Choate*, upon which the Third Circuit has relied.

Moreover, the Court may not need to reach the question of intentionality in

this case. S.H. requested not only compensatory damages but also "other relief,"

both of which are available under Section 504 and the ADA. Appellants' Amended

Complaint to the Trial Court requests the following relief:

1. Order the District to provide S.H. with additional educational
   services designed to remediate any deficiencies caused by her
   misidentification and misplacement into special education . . . .

2. After a jury trial, award S.H. with monetary damages . . . .

   . . .

5. Order such other relief as this Court deems appropriate.

App. 67.

While it is true that S.H. sought monetary damages, she also sought other

relief, including "additional educational services." Such a remedy is available

under Section 504. *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 804 (3d Cir. 2007)

(en banc) (under Section 504, compensatory damages, injunctive relief and other

forms of relief traditionally available in suits for breach of contract are available).

Clearly, "additional educational services" are more in the nature of compensatory

education than money damages. All three experts whose reports Appellants

proferred recommended "additional educational services." App. 1028 (needs more

practice in reading and math and a school counselor to assist); App. 1045-46 (will

need tutoring for writing, help with self-concept and career counseling); App. 1054

(will need reading help). The Trial Court recognized that just this form of relief

was available under the ADA and Section 504. *See* App. 14. Thus, even if

intentional discrimination must be proven for Appellants to prevail on their request

for compensatory damages, there is no requirement for proof of intent for

Appellants to obtain "other relief" such as the educational services described.

## B. The Facts and Circumstances Under Which LMSD Wrongly Regarded S.H. As Disabled Should Be Considered by a Jury.

LMSD argues that whether it wrongly regarded S.H. as having a Specific

Learning Disability in reading and math acts only as a "trigger" for her coverage

under the statute, and implies that otherwise, its actions in doing so could not form

a factual basis for Appellants' claim. Appellee's Brief at 37-39. While it is true that

LMSD's wrongful actions permit Appellants to bring Section 504 and ADA

claims, the misidentification of S.H. as disabled is itself a violation of the law. It is

well settled that the act of wrongly regarding someone as having a disability when

they do not or treating them as having a disability that they do not have is an

actionable claim in and of itself. In *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008), the court reversed a summary judgment in favor of a terminated experienced pharmacy worker. The worker experienced cerebral palsy (which caused him to have slower speech and difficulty walking) and Wal-Mart management terminated him believing the plaintiff to be "slow" or "had something wrong with him." The court concluded that determining whether Wal-Mart actually "regarded" him as disabled constituted a question of the defendant's intent best left to a jury. *Id.* at 134. Similarly, although LMSD conceded it regarded S.H. as having a Specific Learning Disability, LMSD never agreed that it was wrong to do so. Thus, the facts and circumstances under which LMSD regarded S.H. as having a Specific Learning Disability and the staff's intent in doing so should have been left to a jury. The jury could determine that S.H. did have a Specific Learning Disability, in which case she was not subjected to discrimination. Or, the jury could infer deliberate indifference from the actions of LMSD, find that S.H. never had a Specific Learning Disability, and conclude that her misidentification, resulting exclusion from regular education classes, and adversely impacted GPA constituted discrimination.

### C. S.H. Produced Sufficient Evidence for a Jury to Infer That LMSD Acted with Deliberate Indifference.

LMSD argues that S.H. failed to show that LMSD acted with deliberate indifference. Appellee Br. at 32-45. LMSD then attempts to "refute" the genuine

issues of material fact put forth by S.H. The record, and even LMSD's own brief, establish that there were numerous genuine issues of material fact precluding summary judgment. S.H. argued that she had been discriminated against on four counts: 1) LMSD misidentified her as a student with disabilities; 2) LMSD wrongly placed her into Title I classes; 3) LMSD excluded her from regular education classes, and 4) LMSD placed her in ISL (special education) classes which are not counted towards a student's grade-point average. App. 28.

### 1. **S.H. Raised a Genuine Issue of Material Fact About Her Placement Into Title I Classes**

LMSD does not dispute that Ms. Durrell was misled into believing LMSD's Title I program offered enrichment rather than remedial instruction, but instead contends merely that this point "is not supported by the portions of the record that Plaintiffs cite." Appellee's Brief at 40. In her deposition testimony, Lorraine DeRosa, supervisor for Title I, explained that Title I is not "a reading enrichment program" but "is only for students in need of help." App. 1105-06; *see also* App. 1099 (Title I services are 30 minutes a day outside of the regular education curriculum). When asked "[i]f the parent was led to believe that Title I was a reading enrichment program, would that be incorrect?" Ms. DeRosa replied "Yes. And it would have been corrected." App. 1106. Yet when LMSD placed S.H. into its Title I reading program, it characterized the program to her mother as an "enrichment" program to provide an "extra boost." App. 1223; 975. In fact, Ms.

Durrell testified that she did not learn Title I was a remedial program until about two years prior to the date of her deposition in the related *Blunt v. LMSD* matter. App. 1233; 1222 (deposition date of April 18, 2011).

### 2. The Trial Court Acknowledged S.H. Had Raised a Genuine Issue of Material Fact As to Whether LMSD Had Misidentified S.H.

At the Motion to Dismiss stage, the Trial Court specifically held that S.H. had a claim pursuant to the "regarded as" provisions of Section 504 and ADA, App. 12, and at the Summary Judgment stage it concluded that "courts have required some evidence of intent, such as bad faith, gross misjudgment or deliberate indifference to sustain a claim for compensatory damages." App. 29. After the Trial Court denied LMSD's Motion to Dismiss the Section 504 and ADA claims, *see* App. 4, the parties proceeded to conduct discovery and to submit dispositive motions. LMSD argues that "Plaintiffs provide very few citations to the record to support" their "argu[ment] that the evaluations of S.H. were not thorough." Appellee's Brief at 34. But the Trial Court found that S.H. had marshaled sufficient evidence to raise a genuine issue of material fact concerning LMSD's misidentification of her as a student with a Specific Learning Disability in reading and math, because her experts pointed to a number of defects in the initial evaluation and reevaluations of S.H. App. 34. The Trial Court then inexplicably backtracked and instead of applying the *Ridgewood* standard, which does not

require intentionality, erroneously suggested that the claim of misidentification was one of "educational malpractice" rather than the "regarded as" standard of Section 504 and the ADA. App. 34-35.

LMSD further contends that certain "testimony actually establishes that the District had a process for evaluating students and making recommendations with regard to any possible disability or lack thereof." Appellee's Brief at 35. This "process" appears to have been for LMSD psychologists to decide entirely on their own how to evaluate and identify students. App. 1088 (citing no standard for determining underachievement); App. 1193 ("[A]s a psychologist, I came into the position given the latitude to use the formula that I felt was most sound and appropriate."); App. 1203-04 (testifying that "it's entirely up to the psychologist" which model to use for identifying a Specific Learning Disability).

LMSD goes on to argue that "there are no IDEA statutory warnings about over-identification." Appellee's Brief at 36. Yet the IDEA contains not only legislative findings about over-identification, 20 U.S.C. § 1400(c)(12), but also "contains provisions designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of *children as children with disabilities*, *id.* § 1412(a)(24) (emphasis added), and [requires that] data concerning disproportionality in special education will be reported to the federal government, *id.* § 1418(b)." *Lee v. Lee Cnty. Bd. of Educ.*, 476 F. Supp. 2d 1356, 1365 (M.D.

Ala. 2007). Indeed, LMSD's own Director of Student Services has "publically acknowledged" that LMSD "has a recognized issue about disproportionality." App. 1169. LMSD's caricature of Appellants' position as seeking a "racial quota," Appellee's Brief at 36, is utterly without basis, particularly since the IDEA requires that when a district is found to have a disproportionality problem, the district's policies and practices of identification are to be reviewed to determine if any changes are required to prevent inappropriate identification. *Memorandum to State Directors of Special Education*, 48 IDELR 193 (OSEP Apr. 24, 2007).

As for the testimony of Ms. Cucinotta, LMSD artfully states that "Ms. Cucinotta never testified that no one from the IEP team performed an observation of S.H." Appellee's Brief at 42. This is true as far as it goes, but in fact, no one from the IEP team performed an observation of S.H. as was required according to both LMSD psychologist Dr. Craig Cosden, App. 968 (testifying that there was no observation as required); and Ms. Cucinotta, App. 1087 (testifying that she did not conduct any observation or review any written observation by anyone else). LMSD next makes the odd assertion that "Plaintiffs . . . claim that Ms. Cucinotta ignored S.H.'s 'fifth-grade reading scored demonstrating above-grade-level reading skills,'" and then proceeds to dismantle Appellants' argument with respect to Ms. Cucinotta. Appellee's Brief at 42. The fatal flaw in LMSD's argument is that Appellants' brief, by its plain language, attributes this failure to *LMSD*, not to

Ms. Cucinotta. LMSD goes on to claim that Ms. Cucinotta did consider the tragic events in S.H.'s family, but it simply cites her self-serving testimony to that effect, omitting mention of the fact that Ms. Cucinotta's written report was completely silent about these tragedies. Appellee's Brief at 43.

Independent Educational Evaluator Umar Abdullah-Johnson testified that he had no doubts that S.H. never did have a Specific Learning Disability, App. 997, and that since her standard scores were in the average limits, he did not see how that substantiated a Specific Learning Disability, App. 987., that he reviewed the fifth grade Woodcock-Johnson Reading Test and that the test "should have raised a concern about why she was initially classified, App. 991-992, and that Dr. Cosden should have been aware of this test. App. 994. In short, he testified at the hearing:

> It looks like a clear-cut case where an error was made. There's no deficiency and they still said learning disability . . . I don't see how a competent psychologist came to that conclusion.

App. 999.

Finally, once again, pointing the finger at Ms. Durrell will not work. Ms. Durrell, who has no college degree and no knowledge about testing, trusted LMSD staff she thought were professionals. App. 977-79. She would not have agreed to S.H.'s placement in special education if she had realized S.H.'s initial evaluation showed she had average academics. App. 978.

3. **The Trial Court Acknowledged that S.H. Had Raised a Genuine Issue of Material Fact As to Whether the District Was Cooperative with Initial Attempts to Remove S.H. from Special Education and Its Psychologist Lied to the Family.**

The Trial Court also concluded that S.H. had raised "at least some evidence" that LMSD was not cooperative with initial attempts to remove S.H. from special education and that its psychologist, Dr. Craig Cosden—the same individual who declared S.H. to have a Specific Learning Disability—had openly admitted to lying to the family. App. 34. The Trial Court again minimized this evidence as probative of nothing more than "educational malpractice." *Id.* This was error. Here, where one of the key disputes was whether LMSD incorrectly regarded S.H. as having a disability, LMSD's lack of initial cooperation about removing S.H. from special education, along with the lying psychologist, were facts to be heard by the jury. It is the jury, and not the Court, that must judge credibility, *e.g.*, *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999), and the Court wrongly invaded the province of the jury on this point. The Court remarked that the protocols about which Dr. Cosden lied were not before him; they did not need to be. What was clearly before the Court was that one of the key professional witnesses for LMSD, and one who declared that S.H. was disabled, was admittedly dishonest with regard to the circumstances of S.H.'s identification, and the jury should have been allowed to hear that. The facts and circumstances leading to S.H.'s misidentification at the hands of Ms. Cuccinotta and the lying Dr. Cosden should have been heard and

considered by the jury to determine whether she really was disabled and, if not, whether LMSD discriminated against her by determining her to be disabled.

When S.H. was referred for special education testing as a rising fifth-grade student, she told the evaluator that she did not want to go into special education. App. 950. She repeated this concern to teachers in middle school. App. 927-29. LMSD was dismissive of her concerns at the time and remains so today, *see* Appellee's Brief at 33 (suggesting that "a statement from such a young child" would not "be sufficient to raise . . . notice" that "violation of S.H.'s rights was substantially likely"), yet also boasts that its evaluating psychologist *did* "t[ake] it 'very seriously' when S.H. expressed that she did not want to go into special education," Appellee's Brief at 43. Finally, S.H. declined to attend special education, and Ms. Durrell asked that she be excused from attending ISL. App. 983-985, 989. Although Appellants cited these fact issues before the Trial Court, App. 887, the Trial Court did not discuss or make any findings about these issues.

### 4. **S.H. Raised a Genuine Issue of Material Fact About Course Selection and the GPA Policy.**

Although LMSD persists in claiming that "[t]he course selection **process**" was the same in middle school and in high school for S.H. as for children who were not regarded as disabled, Appellee's Brief at 34 (emphasis added), the relevant facts are that LMSD prevented S.H. from taking Social Studies, Science and Spanish classes during middle school because it scheduled her for special

education classes instead, App. 1188; App. 1041; 937; 923, and in high school LMSD placed her into classes that limited her ability to achieve a high GPA. The evidence in the record establishes that in LMSD, tenth, eleventh, and twelfth graders can take extra core classes and thus gain an opportunity to increase their grade-point averages ("GPAs"), but students who need to take additional ISL courses do not have a matching opportunity to boost their GPAs. App. 1131-32. As the Trial Court found, it is the practice and policy of LMSD not to include ISL course grades in the determination of a special-education student's GPA. App. 23; *accord* App. 1122. Only special education students take ISL courses, and therefore only special education students are subject to the policy of no GPA credit for ISL courses. App. 1152. LMSD's witness on Section 504 practices and procedures was unaware until the day of his deposition of LMSD policy excluding ISL course grades from a student's GPA. App. 1150-51, and was unaware of whether this LMSD policy is consistent with Section 504, App. 1153. LMSD's argument that Ms. Durrell and S.H. help to select her courses is unavailing. During the 2008-2009, and 2009-2010 school years (S.H.'s freshman and sophomore years), LMSD's written policy was that if the parent overrode a course recommendation, and the student was not succeeding in the course, the student could only drop the course—not transfer. App. 1126-27; 1129-30; 1253-54. Principal Hockfield

claimed that the district "didn't really" use this policy but admitted a parent, reading the policy and the override form, would not know that. App. 1125-26.

## CONCLUSION

For the reasons set forth above and in Appellants' opening brief, the Court should reverse the Trial Court's dismissal of Appellants' claim for misidentification under the IDEA and should reverse the Trial Court's summary judgment on Appellants' Section 504 and ADA claims.

Respectfully submitted,

*/s/ Sonja D. Kerr*
Sonja D. Kerr (Pa. Bar No. 95137)
Benjamin D. Geffen (Pa. Bar No. 310134)
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Pkwy., 2nd Floor
Philadelphia, PA 19103
Phone:       215-627-7100
Fax:          215-627-3183

Dated:       February 1, 2013

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)-(C) because this brief contains 6,979 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14 point Times New Roman, a proportionally spaced typeface, using Microsoft Word 2007 word-processing software.

3. This brief complies with L.A.R. 31(c) because the text of the electronic brief is identical to the text in the paper copies, and a virus detection program, Microsoft Security Essentials version 4.1.0522.0, has been run on the electronic file and no virus or risk was detected.

Respectfully submitted,

/s/ Sonja D. Kerr
Sonja D. Kerr (Pa. Bar No. 95137)
Benjamin D. Geffen (Pa. Bar No. 310134)
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Pkwy., 2nd Floor
Philadelphia, PA 19103
Phone:      215-627-7100
Fax:         215-627-3183

Dated:      February 1, 2013

30

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of the United States Court of

Appeals for the Third Circuit.

Respectfully submitted,

*/s/ Sonja D. Kerr*
Sonja D. Kerr (Pa. Bar No. 95137)
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Pkwy., 2nd Floor
Philadelphia, PA 19103
Phone:      215-627-7100
Fax:        215-627-3183

Dated:      February 1, 2013

## CERTIFICATE OF SERVICE

I, Sonja D. Kerr, hereby certify that on this date, I caused a true and correct copy of the foregoing Reply Brief of Appellants to be served via the Court's Electronic Case Filing system and regular mail to the following:

Jenna B. Berman
Michael Kristofco
Wisler Pearlstine
460 Norristown Road, Suite 110
Blue Bell, PA 19422-0000

Also, I hereby certify that on this date, I caused ten true and correct copies of the foregoing Reply Brief of Appellants to be sent via regular mail to the following:

Marcia M. Waldron, Clerk
Office of the Clerk
United States Court of Appeals
For the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, Pa 19106

Dated:        February 1, 2013        /s/ Sonja D. Kerr
                                      Sonja D. Kerr (Pa. Bar No. 95137)
                                      Benjamin D. Geffen (Pa. Bar No. 310134)
                                      Public Interest Law Center of Philadelphia
                                      1709 Benjamin Franklin Pkwy., 2nd Floor
                                      Philadelphia, PA 19103
                                      Phone:        215-627-7100
                                      Fax:          215-627-3183

**48 IDELR 193**

107 LRP 25408

### Memorandum to State Directors of Special Education

### Office of Special Education Programs

OSEP 07- 09

### April 24, 2007

### Related Index Numbers

**110.015 Office of Special Education Programs (OSEP)**

**155.                    DISCRIMINATION; RACIAL/ETHNIC/CULTURAL**

**470.020 Compliance and Monitoring**

**470.050 Monitoring Responsibilities**

### Judge / Administrative Officer

Alexa Posny, Director

### Case Summary

Special education directors across the country may need to review Part B's requirements for addressing disproportionality if they hope to ensure their state's compliance with the IDEA. Noting that the 2004 amendments "include a more extensive examination of disproportionality and more extensive remedies where findings of disproportionality occur," OSEP emphasized that states must understand the distinction between their monitoring and review duties. With regard to monitoring, OSEP observed that states must review individual LEAs to determine the extent to which the disproportionate representation of racial and ethnic minorities results from inappropriate identification. OSEP explained that the states must annually report their findings to both the public and the U.S. Department of Education. As for the review obligation, OSEP indicated that states must collect and examine data to determine whether a significantly disproportionate number of minority students are being identified as having disabilities, placed in particular education settings, or disciplined more extensively. If a state makes a determination of significant disproportionality, it must review the LEA's identification, placement and discipline procedures; require the LEA to reserve the maximum amount of Part B flow-through funds for comprehensive coordinated early intervention services; and require the LEA to publicly report on the changes to its policies, practices and procedures.

### Full Text

### Appearances:

#### Memorandum

As you know, the disproportionate representation of children from diverse racial and ethnic backgrounds in special education is a longstanding national issue and continues to concern the public. The phenomenon of disproportionality is particularly troubling when one considers that the proportion of minority students in the population of school-age children has risen dramatically -- to 35% as of 2000 -- increasing the diversity of students in many public schools throughout the nation. As minority children continue to comprise an increasing percentage of public school students, the Federal government must be responsive to the growing needs of an increasingly diverse society.

Excerpts from findings in the Individuals with Disabilities Education Act (IDEA) 2004's statute note that: (1) greater efforts are needed to prevent the intensification of problems connected with mislabeling minority children with disabilities; (2) African-American children are identified as having mental retardation and emotional disturbance at rates greater than their white counterparts; (3) more minority children continue to be served in special education than would be expected from the percentage of minority students in the general school population; (4) in the 1998-1999 school year, African-American children represented 14.8% of the population aged 6 through 21, yet comprised 20.2% of all children with disabilities served in our schools; and (5) studies have found that schools with predominately white students and teachers have placed disproportionately high numbers of their minority students into special education.

Copyright © 2012 LRP Publications

The Department understands the complexities States are facing in fully addressing disproportionate representation. The IDEA requires States and local educational agencies (LEAs) to take steps to address disproportionate representation in special education. The statute and regulations for IDEA-Part B include important changes in how States and LEAs now must address disproportionate representation in special education. Changes in Part B include a more extensive examination of disproportionality and more extensive remedies where findings of disproportionality occur. In order to properly implement these changes, it is critical for States to understand the differences between the requirements in the monitoring priority indicators (Indicators 9 and 10) that address disproportionality that is the result of inappropriate identification [20 U.S.C. 1416(a)(3)(C); 34 CFR §§ 300.173 and 300.600(d)(3)] and the requirements concerning significant disproportionality identified through the collection, and examination of data [20 U.S.C § 1418(d); 34 CFR § 300.646(b)].

## Disproportionality as a Monitoring Priority Area

States are required to address disproportionality that is the result of inappropriate identification in the State Performance Plan (SPP) Indicators 9 and 10. Under these indicators, which are based on statutory language at 20 U.S.C. 1416(a)(3)(C), States are required to review the LEAs in the State to determine the extent to which the disproportionate representation of racial and ethnic groups in special education is the result of inappropriate identification. Failure to conduct this analysis will be cited as noncompliance with the requirements of 34 CFR § 300.600(d)(3)which requires that States monitor LEAs with regard to disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification.

We believe that the inclusion of disproportionality that is the result of inappropriate identification in the State monitoring and enforcement

component of the law clearly reflects the seriousness with which Congress viewed this issue. The focus of monitoring priority indicators 9 and 10 of the SPP is on disproportionate representation that is the result of inappropriate identification. This language signals that more than just an examination of numerical information is required to respond to and appropriately address the monitoring indicators. After reviewing the numerical Information, States need to probe instances in which they identify disproportionality to determine whether it is the result of inappropriate identification.

States must report annually to the Secretary on the performance of the State on these indicators. States also must report to the public on the performance of each LEA in the State on an annual basis. This annual report must include the State's findings regarding disproportionality in the LEAs in the State resetting from inappropriate identification related to representation of racial and ethnic groups in special education and the representation of racial and ethnic groups in specific disability categories.

## Significant Disproportionality

States have a separate obligation, under 20 U.S.C. 1418(d) and 34 CFR § 300.646, to collect and examine data to determine whether significant disproportionality based on race or ethnicity is occurring in the State and LEAs of the State with respect to the identification of children as children with disabilities, including identification as children with particular impairments; the placement of children in particular educational settings; and the incidence, duration, and type of disciplinary actions, including suspensions and expulsions. States must make this determination on an annual basis. When the State educational agency (SEA) identifies LEAs with significant disproportionality in one or more of these areas based on the collection and examination of their data, States must: 1) provide for the review (and, if appropriate) revision of policies, procedures, and practices; 2) require the LEA to reserve the maximum amount offends to be used for early intervening services; and 3) require the LEA to publicly report on

the revision of policies, procedures, and practices.

With one important caveat, each State has the discretion to define what constitutes significant disproportionality for the LEAs in the State and for the State in general. The caveat is that a State's definition of significant disproportionality needs to be based on an analysis of numerical information, and may not include consideration of the State's or LEA's policies, procedures or practices. This is because section 618(d)(2) of the Act is clear that a review of policies, practices and procedures is a consequence of, rather than a part of a determination of significant disproportionality by race or ethnicity. Therefore, in identifying significant disproportionality, a State may determine statistically significant levels of disproportionality. There are multiple factors at the State level to consider in making such determinations. For example, States may want to consider the population size, the size of individual LEAs, and the composition of the State population.

When States make determinations of significant disproportionality based on race or ethnicity with respect to the identification of children as children with disabilities, the placement in particular educational settings of these children, or the incidence, duration, and type of disciplinary actions (including suspensions and expulsions), three important provisions are triggered.

First, the State must provide for the review and, if appropriate, revision of the policies, procedures, and practices used in the identification, placement, or discipline of children with disabilities, to ensure that the policies, procedures, and practices comply with the requirements of the Act. [34 CFR § 300.646(b)(l)] The review of LEAs' policies, practices, and procedures for identifying, placing, and disciplining children with disabilities would occur for LEAs that, based on the numerical analysis, were identified as having significant disproportionality in identification, placement, or discipline. The purpose of this review is to determine if the policies, practices, and procedures are consistent with the requirements of the IDEA.

Second, in the case of a determination of significant disproportionality with respect to the identification of children as children with disabilities, the placement in particular educational settings of such children, or disciplinary actions, the SEA must require the LEA to reserve the maximum amount (15%) of the flow-through funds it receives under Part B of IDEA to provide comprehensive coordinated early intervening services (EIS) to serve children who have not been identified as children with disabilities in the LEA, particularly, but not exclusively, children in those groups that were significantly overidentified. [34 CFR § 300.646(b)(2)] The Department interprets the phrase "reserve the maximum amount of funds" as meaning to use the funds for early intervening services. The statute does not authorize LEAs to use these funds for any other purpose. It is important to note that the obligation to use 15% of the LEA's IDEA funds for EIS is triggered solely on a determination of significant disproportionality. In other words, the obligation to reserve funds for EIS occurs independent of any analysis of whether that disproportionality is the result of inappropriate identification.

The third provision at 34 CFR § 300.646(b)(3) requires the LEA to publicly report on the results of its revision of policies, practices, and procedures used in identification, placement or discipline of children with disabilities (described under 34 CFR § 300.646(b)(l)).

## Conclusion

The disproportionate representation of minority students in special education is an important issue for States to address. The Department believes that States and LEAs are making a concerted effort to reduce racial and ethnic disproportionality in identification, placement and disciplinary actions. This memorandum references the key provisions under Part B of IDEA regarding the responsibilities of States and LEAs in addressing disproportionality. It is critical for States to understand the differences in the requirements between the monitoring priority indicators that address disproportionality that is the result of inappropriate identification [20 U.S.C.

1416(a)(3)(C); 34 CFR § 300.600(d)(3)] and the separate and distinct obligation to collect and examine numerical data to determine if significant disproportionality is occurring. [20 U.S.C. § 1418(d); 34 CFR § 300.646(b)] See the attached chart that clearly presents these two distinct requirements.

We understand the complexities associated with fully addressing racial and ethnic disproportionality and encourage States and LEAs to utilize the resources provided by the National Center for Culturally Responsive Educational Systems (NCCRESt). This information can be located at: www.nccrest.org.

If you have any questions about implementing the IDEA requirements related to disproportionality, please contact your Part B State contact in OSEP.

### Attachment

### Disproportionate Representation and Significant Disproportionality: Requirements in IDEA 2004

Disproportionate Representation Significant Disproportionality 300.173: State must have policies and procedures designed to prevent inappropriate overidentification and disproportionate representation by race and ethnicity of children with disabilities including children with disabilities with particular impairments. 300.600: State must monitor LEAS in the priority areas: Disproportionate representation of racial and ethnic groups in special education and related services to the extent the representation is the result of inappropriate identification. 300.646: Collect and examine data to determine if significant disproportionality based on race and ethnicity is occurring in the State and LEAs with respect to identification of children with disabilities, including children with disabilities in accordance with particular impairments, placement in particular educational settings and incidence, duration and type of disciplinary actions, including suspensions and expulsions. Collect and examine data Identify LEAs with disproportionate representation, and of those, the number where the disproportionate representation is the result of inappropriate identification of children with disabilities, including children with disabilities with particular impairments (Indicator 10). Require LEAs with significant disproportionality to reserve 15% for EIS. Identifying inappropriate identification could include a review of policies, procedures and practices related to identification of children with disabilities (Indicator 9), including children with disabilities with particular impairments (Indicator 10). Review policies, procedures and practices related to: Identification of children with disabilities, including children with disabilities with particular impairments, placement in education settings and incidence and duration of disciplinary actions. If disproportionality is due to inappropriate identification, require the LEA to correct the noncompliance, including revising deficient policies, procedures and practices. If policies, procedures or practices are deficient, require the LEA to revise to comply with the requirements. SEA must report in APR as follows: (# due to inappropriate identification)/all LEAs) and in the next APR report on correction. Require the LEA to publicly report on the revision of policies, procedures and practices.

**Statutes Cited**

20 USC 1416(a)(3)(C)

20 USC 1418(d)

**Regulations Cited**

34 CFR 300.173

34 CFR 300.600(d)(3)

34 CFR 300.646(b)

34 CFR 300.646

34 CFR 300.646(b)(1)

34 CFR 300.646(b)(2)

34 CFR 300.646(b)(3)

**52 IDELR 267**

109 LRP 41918

### Questions and Answers on Disproportionality

### Office of Special Education and Rehabilitative Services

N/A

### June 1, 2009

**Related Index Numbers**

110.020 State Educational Agencies (SEAs)

470.050 Monitoring Responsibilities

**Judge / Administrative Officer**

N/A

**Case Summary**

Under most circumstances, states' collection and examination of data relating to possible disproportionality must take into account students in residential facilities and group homes. However, OSERS explained that whether and how a state must factor such children into its disproportionality calculations depends on what agency places them and where the facility or group home is located. For instance, the state must consider all such students when an educational agency within the same state places them in a residential facility or group home. However, that data would factor into the state's disproportionality calculation for the district which placed the child, not the district in which the facility or group home is located. Furthermore, OSERS observed that a state may exclude from its disproportionality calculations altogether children who are placed in a residential facility or group home by a noneducational agency, such as a court or the department of social services. In that case, neither the state in which the child resides nor the state where the facility or group home is located need include the child in its disproportionality analysis. Finally, OSERS noted that children placed in an out-of-state residential facility or group home by an educational agency must be included in a state's calculation of significant disproportionality only with regard to the district that placed the child.

**Full Text**

**Appearances:**

### Questions and Answers on Disproportionality

### June 2009

Regulations for Part B of the Individuals with Disabilities Education Act (IDEA) were published in the Federal Register on August 14, 2006, and became effective on October 13, 2006. Additional regulations were published on December 1, 2008 and became effective on December 31, 2008. Since publication of the regulations, the Office of Special Education and Rehabilitative Services (OSERS) in the U.S. Department of Education (Department) has received requests for clarification of some of these regulations. This is one of a series of question and answer (Q&A) documents prepared by OSERS to address some of the most important issues raised by requests for clarification on a variety of high-interest topics. Each Q&A document will be updated to add new questions and answers as important issues arise or to amend existing questions and answers as needed.

OSERS issues this Q&A document to provide States, State educational agencies (SEAs), and local educational agencies (LEAs) with information regarding the IDEA requirements relating to disproportionality determinations. This Q&A document represents the Department's current thinking on this topic. It does not create or confer any rights for or on any person. This guidance does not impose any requirements beyond those required under applicable law and regulations. This Q&A document supplements the Department's guidance, entitled Disproportionality of Racial and Ethnic Groups in Special Education, issued on April 24, 2007.

IDEA requires States and LEAs to take steps to address disproportionate representation of racial/ethnic groups in special education. The statute, as amended in 2004, and the Part B regulations include important changes in how States must

monitor the LEAs in the State to determine disproportionate representation of racial and ethnic groups in special education and related services that is the result of inappropriate identification. 20 U.S.C. 1416(a)(3)(C); 34 CFR § 300.600(d)(3).

States have a separate obligation, under 20 U.S.C. 1418(d) and 34 CFR § 300.646, to collect and examine data to determine whether significant disproportionality based on race and ethnicity is occurring in the State and LEAs of the State with respect to the identification of children as children with disabilities, including identification as children with particular impairments; the placement of children in particular educational settings; and the incidence, duration, and type of disciplinary actions, including suspensions and expulsions. Where significant disproportionality is occurring, the State must provide for the review, and, if appropriate, revision of policies, procedures, and practices used in identification, placement, or discipline to ensure that they comply with the requirements of IDEA; require the LEA to publicly report on the revision of policies, practices, and procedures; and require the LEA to reserve 15 percent of its Part B funds to provide comprehensive coordinated early intervening services to serve children in the LEA, particularly, but not exclusively, children in those groups that were significantly over-identified.

Generally, the questions, and corresponding answers, presented in this Q&A document required interpretation of IDEA and its implementing regulations and the answers are not simply a restatement of the statutory or regulatory requirements. The responses presented in this document generally are informal guidance representing the interpretation of the Department of the applicable statutory or regulatory requirements in the context of the specific facts presented and are not legally binding. The Q&As in this document are not intended to be a replacement for careful study of IDEA and its implementing regulations. IDEA, its implementing regulations, and other important documents related to IDEA and the regulations are found at http://idea.ed.gov.

If you are interested in commenting on this guidance, please email your comments to OSERSguidancecomments@ed.gov and include Disproportionality in the subject of your email or write us at the following address: Patricia Guard, U.S. Department of Education, Potomac Center Plaza, 550 12th Street, SW, room 4108, Washington, DC 20202.

## A. Reporting Requirements

Authority: The requirements for reporting on disproportionality are found in the regulations at 34 CFR §§ 300.600(d) and 300.646.

Question A-1: Are States required to report data regarding significant disproportionality, collected and examined pursuant to 34 CFR § 300.646, in their Annual Performance Reports (APRs)?

Answer: No, States are only required to report, in their APRs, on LEAs with disproportionate representation of racial and ethnic groups in special education that is the result of inappropriate identification as required by 34 CFR § 300.600(d)(3).

Question A-2: Are the reporting requirements under 34 CFR § 300.646 different from the reporting requirements under Indicators 9 and 10 in the SPP?

Answer: Yes. In accordance with the requirements in 20 U.S.C. 1416(a)(3)(C) of the IDEA and 34 CFR § 300.600(d)(3), an SPP and APR must address the percent of LEAs with disproportionate representation of racial and ethnic groups in special education and related services (Indicator 9) and in specific disability categories (Indicator 10) that is the result of inappropriate identification. As stated in the Answer to Question A-1 above, States are not required to report on the collection and examination of data to determine significant disproportionality, pursuant to 34 CFR § 300.646, in the APR. Although not required to report to the Department, if a State determines that significant disproportionality based on race and ethnicity is occurring in a particular LEA with respect to identification of children as children with disabilities, including identification as children with particular impairments, placement in particular

Copyright © 2012 LRP Publications

educational settings, or the incidence, duration, and type of disciplinary actions including suspensions and expulsions, the State must require the LEA to review and if appropriate revise its policies, procedures or practices and to publicly report on the revision of its policies, practices, and procedures consistent with 34 CFR § 300.646.

## B. Exceptions for Significant Disproportionality

Authority: The requirements for collecting and examining data to determine significant disproportionality are found in the regulations at 34 CFR § 300.646.

Question B-1: Must a State include children placed in residential facilities or group homes in its calculation of significant disproportionality under 34 CFR § 300.646? Does it matter if the child is placed in a different State?

Answer: Whether a State must include or may exclude a child with a disability in its calculation of significant disproportionality depends on the agency that places the child in a residential facility or group home and the location of the residential facility or group home, as described below:

(i) All children with disabilities placed in a residential facility or group home in the same State by an educational agency must be included in the calculation of significant disproportionality. For purposes of calculating significant disproportionality, however, a State should assign responsibility for counting children with disabilities placed in out-of-district placements to the LEA that is responsible for providing FAPE for those children rather than the LEA in which the child has been placed.

(ii) Children with disabilities placed in residential facilities or group homes in the same State by a noneducational agency (e.g., court systems, Department of Corrections, Department of Children, Youth and Families, Social Services, etc.) may be excluded from a State's calculation of significant disproportionality.

(iii) Children with disabilities placed in a residential facility or group home in a different State by an educational agency should be included in a State's calculation of significant disproportionality in the LEA responsible for providing FAPE for that child (the placing LEA).

(iv) Children with disabilities placed in a residential facility or group home in a different State by a noneducational agency (e.g., court systems, Department of Corrections, Department of Children, Youth and Families, Social Services, etc.) may be excluded from the calculation of significant disproportionality by both the State in which the child resides and the State where the residential facility or group home is located.

**Statutes Cited**

20 USC 1416(a)(3)(C)
20 USC 1418(d)

**Regulations Cited**

34 CFR 300.600(d)(3)
34 CFR 300.646