**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3264
_____

S.H., By and Through her Parent and Educational Decision
Maker, Carol Durrell; CAROL DURRELL,
Appellants

v.

LOWER MERION SCHOOL DISTRICT
_____

APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. Action No. 10-cv-06070)
District Judge: Honorable Harvey Bartle, III
_____

Argued: May 23, 2013
_____

Before: RENDELL, GREENAWAY, JR., *Circuit Judges*, and
ROSENTHAL[*], *District Judge.*

_____

[*] Honorable Lee H. Rosenthal, District Judge, United States
District Court for the Southern District of Texas, sitting by
designation.

1

(Opinion Filed:  September 5, 2013)

_____

OPINION
_____

Sonja D. Kerr, Esq. (argued)
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway
United Way Building, 2nd Floor
Philadelphia, Pennsylvania  19103
        *Counsel for Appellants S.H. and Carol Durrell*

Michael D. Kristofco, Esq. (argued)
ShaVon Y. Savage, Esq.
Jenna B. Berman, Esq.
Amy T. Brooks, Esq.
Wisler Pearlstine LLP
460 Norristown Road
Suite 110
Blue Bell, Pennsylvania  19422
        *Counsel for Appellee Lower Merion School District*

GREENAWAY, JR., *Circuit Judge*.

        On November 5, 2010, S.H. and her mother, Carol Durrell ("Ms. Durrell") (collectively, "Appellants") filed suit against Lower Merion School District ("School District"), alleging violations of the Individuals with Disabilities Education Act ("IDEA"), § 504 of the Rehabilitation Act

("RA"), and § 202 of the Americans with Disabilities Act ("ADA"). Appellants contend that the School District misdiagnosed S.H. as disabled for several years, and that, as a result, it is liable under the IDEA for compensatory education and under the RA and ADA for compensatory damages. The District Court dismissed Appellants' IDEA claim for failure to state a claim. The District Court then granted summary judgment in the School District's favor as to the RA and the ADA claims. This appeal followed. For the reasons set forth below, we will affirm.

## I.    BACKGROUND

### A.    Facts

S.H., who is African-American, began attending Penn Valley Elementary School in the Lower Merion School District in kindergarten. Beginning in first grade (the 2000-2001 school year), S.H. was placed in Title I classes.[1] Ms. Durrell received a brochure and letters explaining Title I services and consented to S.H.'s enrollment in the program. S.H. received Title I services from first grade through fifth grade.

---

[1] Title I is a federally funded remedial program designed to improve a student's academic performance in reading and math. Title I supplements a student's regular school program work by providing the student with extra instruction in the student's regular classroom. Title I is not intended strictly for disabled students, but for any student in need of extra help.

3

On October 2, 2001, when S.H. was in second grade, Ms. Durrell met with Santa Cucinotta, the school psychologist ("Ms. Cucinotta"), the school counselor, and the principal.  At this conference, they discussed that S.H. was having difficulty with confidence, as well as reading, writing, and getting her thoughts on paper.  The team collectively agreed that S.H. should continue to receive Title I reading services.  After this meeting, Ms. Cucinotta began to monitor S.H.'s progress in her classes.  The School District also created a "Child Study Team" to monitor S.H.'s progress. Ms. Durrell participated in many of the Child Study Team meetings.

When S.H. was in third grade (the 2002-2003 school year), Ms. Cucinotta and Ms. Durrell again discussed S.H.'s difficulties in school.  During the spring of that year, S.H. scored below the benchmark[2] on the reading portion of the Pennsylvania System of School Assessment ("PSSA").[3]  On May 23, 2003, Ms. Durrell met with the school counselor and the principal.  They agreed that, while S.H. was "enthusiastic"

---

[2] Throughout the record, there are references to S.H.'s scores on standardized tests as compared to benchmark scores. However, aside from the absolute numerical value, we have been provided no information with which to contextualize these scores.  Without additional insight as to their meaning, we can ascribe only limited weight to these scores as part of our analysis.

[3] S.H. scored 1217 when the benchmark score for a student her age was 1321.

and "had a nice grade 3 experience," the team needed to develop strategies directed toward improving S.H.'s attention and focus.  (App. 464.)

At the beginning of S.H.'s fourth-grade year (the 2003-2004 school year), S.H. scored below the benchmark score on the Degrees of Readings Powers ("DRP") test.[4]  On February 24, 2004, the Child Study Team, consisting of Ms. Durrell, Ms. Cucinotta, the school counselor, and S.H.'s fourth-grade teacher, met to discuss S.H.'s progress.  They talked about S.H.'s enthusiasm for certain activities, but noted her unwillingness to continue participating in Title I reading classes, and her difficulties with "place value" in math, and "decoding" and "understanding the main idea" in reading. (App. 465.)  The team decided to send a referral packet to pupil services for S.H. and issued a Permission to Evaluate ("PTE"), which is a request to the parent that the student be evaluated in order to determine eligibility and need for special education services.  Ms. Durrell consented to the evaluation. That year, S.H.'s fourth-grade teacher also explained to Ms. Durrell that S.H. was "struggling" in her studies.  On June 6, 2004, the School District issued another PTE for S.H., and on June 8, Ms. Durrell again consented.

Ms. Cucinotta began the evaluation in June 2004, using the predicted achievement model to assess S.H.[5]  The

---

[4] S.H. scored 38 when the benchmark score for a student her age was 42-48.

[5] The predicted achievement model is an accepted model within the School District for evaluating students.  Under this model, a computer program generates an expected

results revealed a 16-point discrepancy between S.H.'s expected score of 106 and her Reading Comprehension score of 90.[6] As part of the evaluation, Ms. Cucinotta considered whether any mitigating factors would have affected S.H.'s achievements, such as S.H.'s personal or familial circumstances.[7] Ms. Cucinotta also spoke with Ms. Durrell, reviewed a literacy specialist's evaluations of S.H. from the end of third grade and the beginning of fourth grade, and considered S.H.'s below-benchmark PSSA and DRP scores. Ms. Cucinotta considered the testing scores, as well as her own "clinical observations of [S.H.'s] language processing, the difficulty [S.H.] had with directions, [and] the vocabulary that [S.H.] didn't understand." (App. 381.)

Ms. Cucinotta concluded her evaluation at the beginning of S.H.'s fifth-grade year (the 2004-2005 school year), and published the results in two evaluation reports, dated September 2 and 13, 2004. As a result of the evaluation, Ms. Cucinotta determined that S.H. had a learning

---

achievement score based on the student's IQ, which is then compared to the student's actual score.

[6] Joanna Wexler, a psychologist for the School District, testified in her deposition that a 15-point discrepancy between the expected achievement score and the actual achievement score is considered an indication of a learning disability.

[7] In January of 2002, tragedy struck S.H.'s family when a murder-suicide took the lives of five of S.H.'s relatives, including a 14-year-old cousin with whom S.H. was very close. S.H. took these deaths particularly hard and had difficulty coping with them.

disability in reading and math and recommended that she receive specially designed instruction in these areas. The reports also noted that S.H. was unhappy that she was designated as disabled and had told Ms. Cucinotta that she did not think she belonged in special education. Ms. Durrell reviewed and signed the evaluation reports, indicating that she agreed with the recommendations.

Following her designation as disabled, a team was assembled to develop an Individualized Education Program ("IEP") for S.H. The record indicates that the IEP team considered S.H.'s personal sentiment that she did not want to be in special education, and that Ms. Cucinotta and a guidance counselor subsequently discussed S.H.'s feelings with her. On October 1, 2004, Ms. Durrell attended an IEP meeting for S.H., during which Ms. Durrell received and approved the Notice of Recommended Placement ("NOREP"). The NOREP indicated that S.H. would receive special education services during her fifth-grade year — specifically, learning support in the resource room as well as itinerant speech and language therapy.

On November 14, 2004, the IEP team met again to create a revised IEP for S.H., which Ms. Durrell approved. A revised NOREP was subsequently issued, indicating that S.H. would continue to receive speech and language therapy, and would also be placed in a part-time learning support class called Instructional Support Lab ("ISL").

On January 25, 2005, when S.H. was in fifth grade and less than three months after she was placed in special education, S.H. scored above-grade level on the Woodcock Reading Mastery Test. She scored at a 5.3 grade level in

word identification, 6.4 grade level in word attack, and 6.7 grade level in word comprehension.

From sixth to eighth grade, S.H. attended Welsh Valley Middle School in the School District. S.H.'s IEP team selected her classes, with her mother's approval. When S.H. was in sixth grade, the IEP team developed a new IEP providing S.H. with accommodations for standardized testing. Ms. Durrell agreed to these accommodations.

On October 5, 2006, Ms. Durrell emailed S.H.'s seventh-grade ISL teacher and stated, "I am really concerned about [S.H.'s PSSA] score. She is below proficiency. Could we consider having her work with the Reading Specialist . . . she needs some one-to-one instruction to bring her up to proficiency. This is a real concern for me now. . . it is obvious that more needs to be done." (App. 223-24, 573.) In response to this email, the School District provided S.H. with one-on-one instruction with a reading specialist. S.H. again confided in her seventh-grade teacher that she was unhappy with ISL and didn't feel like she needed the extra help.

On May 23, 2007, when S.H. was in seventh grade, the School District issued an evaluation report analyzing S.H.'s academic progress. The report indicated that S.H. was receiving good grades in her classes and had made positive progress toward her IEP goals. The report recommended S.H. be removed from special education services for language arts due to her progress in that area, but that she continue to receive specialized instruction in reading and writing. Following the 2007 evaluation, these recommendations were implemented. Because S.H. continued to receive special education, there was not time in her schedule for her to take eighth-grade science and Spanish.

S.H. began attending Lower Merion High School when she was in ninth grade (the 2008-2009 school year). The School District created a suggested schedule of classes for S.H.'s ninth-grade year, which included ISL, and sent the schedule home to Ms. Durrell. All parents of rising ninth-graders had the option of requesting a change in their child's suggested course schedule. Ms. Durrell had this option of picking different courses for S.H., but elected not to do so. That fall, S.H. scored just below the benchmark on the Advanced Degrees of Reading Power Test.[8]

On April 21, 2009, the School District issued a second PTE for S.H. to determine if she still needed special education; Ms. Durrell consented to the evaluation. Dr. Craig Cosden ("Dr. Cosden"), a School District psychologist, performed the evaluation. As part of the evaluation, Dr. Cosden spoke with both S.H. and Ms. Durrell, obtained reports from S.H.'s teachers, discussed S.H.'s progress with both the Literacy Specialist and the Math Specialist, and reviewed S.H.'s grades and scores on standardized tests. Dr. Cosden determined that S.H. had average intelligence, but consistently demonstrated achievement levels below her intelligence level in the areas of reading and math. The evaluation report also indicated that S.H. had a specific learning disability, although the disability was not identified.

---

[8] S.H. scored 49 when the benchmark score for a student her age was 50-70.

Dr. Cosden thus concluded that S.H. was still in need of special education in reading and math.[9]

S.H. continued to have ISL classes in tenth grade. On November 2, 2009, Ms. Durrell requested that the School District remove S.H. from ISL and place her in study hall. The School District changed S.H.'s schedule in accordance with this request within two days.

The School District complied with Ms. Durrell's other requests as well. For example, on November 13, 2009, Ms. Durrell emailed Dr. Kimberly Fedchak ("Dr. Fedchak"), a school employee, to ask if Dr. Fedchak could meet with S.H. one-on-one for additional instruction. Ms. Durrell wrote, "I would like to know if [S.H.] can come in to work with you one-on-one, during academic recovery to go over her test corrections. She said she didn't have a clear understanding of the material. She does have math goals in her IEP. I feel the more individual instruction she has, the better she'll do." (App. 237, 704.) Dr. Fedchak agreed.

Also in November of 2009, Dr. Cosden met with Ms. Durrell and Ms. Durrell's legal counsel, as part of an IEP meeting. During this meeting, Ms. Durrell's counsel requested a copy of the testing protocols relating to Dr. Cosden's evaluation of S.H. Dr. Cosden lied to Ms. Durrell and told her that the testing protocols had been destroyed. Dr. Cosden later admitted that he had "intentionally misled the

---

[9] In June 2006, S.H.'s close friend was killed in a car accident, and S.H. struggled to cope with this death. Dr. Cosden's report makes no mention of either this event or the 2002 murder-suicide.

family" because he did not think it was "ethical" for him to disclose the protocols to "persons who have no ability to be able to process and understand the information." (App. 963.)

On November 23, 2009, Ms. Durrell filed a Due Process Complaint Notice, requesting a special education hearing and seeking an Independent Education Evaluation ("IEE"). The School District consented to the IEE, and Ms. Durrell selected Dr. Umar Abdullah-Johnson ("Dr. Abdullah-Johnson"), a nationally certified school psychologist, to perform the evaluation. The IEE was performed in January 2010, and Dr. Abdullah-Johnson published his report on February 24, 2010. His intelligence tests revealed S.H.'s IQ to be 100, which is in the middle of the average range. The achievement test placed S.H. in the "average" range in four out of six composite score areas, in the "below average" range for Reading Comprehension & Fluency, and in the "superior" range for Basic Reading.

Dr. Abdullah-Johnson also determined that any discrepancy between S.H.'s IQ and her achievement scores was too small to constitute a severe discrepancy, and that the data used in the 2004 report prepared by Ms. Cucinotta did not support the School District's conclusion that S.H. had a learning disability. He concluded that S.H.'s designation as learning disabled was, and always had been, erroneous.[10]

---

[10]  Additionally, in connection with this lawsuit, two additional experts, Dr. Tawanna Jones, a certified school psychologist, and Dr. Ronald Rosenberg, a licensed psychologist, also reviewed various documents, including previous evaluations of S.H. and her test scores, and agreed with Dr. Abdullah-Johnson that S.H. was not disabled.

Following Dr. Abdullah-Johnson's evaluation, Ms. Durrell requested that S.H. be removed from special education. Dr. Cosden also prepared a Reevaluation Report. The report discussed S.H.'s academic history and included observations from S.H.'s then-current teachers. Dr. Cosden's report also discussed the test results from Dr. Abdullah-Johnson's evaluation of S.H., although it did not specifically reference Dr. Abdullah-Johnson's determination that S.H. was not, and never had been, disabled. The report did, however, state that S.H. did not have a disability and therefore was no longer eligible to receive special education. On April 12, 2010, the School District issued a NOREP indicating that S.H. did not have a specific learning disability and removing her from special education. S.H. received no special education in her junior and senior years of high school.

As of February 14, 2012, S.H. had been accepted to West Virginia University, Kutztown University, Cabrini College, and Neumann University.

## B.    Procedural History

Following S.H.'s removal from special education, the School District moved to dismiss Ms. Durrell's complaint before the Hearing Officer as moot, because S.H. was not a child with a disability and therefore was no longer entitled to the IDEA's protection.[11]    The Hearing Officer agreed and determined that he did not have jurisdiction over S.H.'s claim

---

[11] For purposes of that motion, as well as for this appeal, the School District concedes that S.H. does not have, and has never had, a learning disability.

because she admitted that she is not disabled and never has been disabled.

On November 5, 2010, Appellants filed suit in federal district court, alleging three claims. Claim One asserted that, under the IDEA, the School District violated its duty to accurately identify children with disabilities and to ensure that S.H. was properly evaluated and assessed as not disabled. Claim Two alleged a violation of § 504 of the RA, and Claim Three alleged a violation of § 202 of the ADA. Claims Two and Three alleged that the School District discriminated against S.H. by erroneously identifying her as a child with a disability.

Appellants sought compensatory education and monetary damages. According to Appellants, S.H.'s receipt of special education services damaged her self-confidence and academic progress. It also prevented her from participating in certain regular-curriculum classes, including science and one year of foreign language during middle school, and higher-level courses in high school. Appellants' expert calculated S.H.'s damages as $127,010, which includes two additional years of college tuition, 50 hours of psychotherapy, and 600 hours of tutoring.

On June 30, 2011, the District Court granted the School District's motion to dismiss Claim One.[12] The

---

[12] The School District also moved to dismiss Claims Two and Three, which the District Court denied. The RA and the ADA create causes of action for individuals who are "regarded as" disabled. 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1)(C). The denial of the motion to dismiss Claims Two and Three is not before us on appeal.

District Court concluded that, because S.H. asserts that she is not disabled, she cannot be, for pleading purposes, "a 'child with a disability' and thus cannot seek relief under the IDEA." *Durrell ex rel. S.H. v. Lower Merion Sch. Dist.*, No. 10-6070, 2011 WL 2582147, at *2 (E.D. Pa. June 30, 2011).[13]

On July 19, 2012, the District Court granted summary judgment in the School District's favor as to the remaining RA and ADA claims. The District Court first ruled that, in order to sustain a claim seeking compensatory damages under the RA and ADA, a plaintiff must be able to show evidence of intentional discrimination on the part of the defendant. *Durrell ex rel. S.H. v. Lower Merion Sch. Dist.*, No. 10-6070, 2012 WL 2953956, at *5-7 (E.D. Pa. July 19, 2012). The District Court then concluded that Appellants had produced no evidence creating a genuine dispute of fact as to intentional discrimination and granted summary judgment. *Id.* at *8 ("While we find any misidentification of S.H. unfortunate, plaintiffs have not come forward with any evidence which would allow a reasonable jury to find that the School District intentionally discriminated against S.H. when it regarded her as disabled.").

Appellants filed a timely appeal.

---

[13] The School District also sought to dismiss Claim One under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. Recognizing that, unless Congress specifically defines a limitation in a statute as jurisdictional, courts "'should treat the restriction as nonjurisdictional in character,'" the District Court dismissed Claim One under Rule 12(b)(6). *S.H.*, 2011 WL 2582147, at *3 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006)).

## II.     JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i).  We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over a district court's decision to dismiss a complaint under Rule 12(b)(6).  *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).  In reviewing a dismissal, we "accept all well-pled allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party."  *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 452 (3d Cir. 2006).  To survive a motion to dismiss, a complaint must contain sufficient factual allegations that, when taken as true, "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A Rule 12(b)(6) motion should be granted when it appears to a certainty that no relief can be granted under any set of facts which could be proved."  *Nichole Med. Equip. & Supply Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 350 (3d  Cir. 2012).

We review a district court's grant of summary judgment de novo, applying the same standard as the district court.  *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 257 (3d Cir. 2012).  A grant of summary judgment is appropriate where the moving party has established "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit under the governing law.  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  The reviewing court should view the facts in the light most favorable to the non-moving party and

draw all reasonable inferences in that party's favor. *Id*. However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III.    ANALYSIS

### A.    IDEA Claim

Appellants argue that the District Court erred when it dismissed their IDEA claim.  Appellants contend that the IDEA's jurisdictional umbrella encompasses not merely children with disabilities, but also children who have been misidentified as disabled.  This question is a matter of first impression for this Court, as it requires us to determine whether the protections and remedies of the IDEA extend beyond children with disabilities.    While Appellants' arguments are emotionally compelling, they are ultimately to no avail.

#### 1. Plain Language of the Statute

This question presents an issue of statutory interpretation.  "Our goal when interpreting a statute is to effectuate Congress's intent.  Because we presume that Congress's intent is most clearly expressed in the text of the statute, we begin our analysis with an examination of the plain language of the relevant provision." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012) (citation and internal quotation marks omitted); *see also Jimenez v.*

*Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute.").  "When the words of a statute are unambiguous, then this first canon [of statutory interpretation] is also the last: judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). Moreover, "where the statutory language is unambiguous, the court should not consider statutory purpose or legislative history," *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010), because we operate under the "assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).

With this framework in mind, we turn to the language of the IDEA.  The IDEA guarantees "procedural safeguards with respect to the provision of a free appropriate public education" to "*children with disabilities* and their parents." 20 U.S.C. § 1415(a) (emphasis added).  Children with disabilities (and their parents) who claim violations of the IDEA can file a complaint with a due process hearing officer. *Id.* § 1415(b)(6).  The complaint may pertain to "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to *such* child."  *Id.* § 1415(b)(6)(A) (emphasis added).  Following the due process hearing, the IDEA permits an aggrieved party to bring a civil action in any court.  *Id.* § 1415(i)(2)(A).  Thus, a child may file a civil suit only if he or she would have been entitled to file a complaint before a hearing officer; it is clear from the plain language that only "children with disabilities and their parents" may do so.

The IDEA defines "child with a disability" to mean

> a child with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (or referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and who by reason thereof needs special education and related services.

*Id.* § 1401(3)(A).  There is no indication that the term "child with a disability" includes children who are mistakenly identified as disabled, but who are, in fact, not disabled.[14] Therefore, under the Act's plain language, it is clear that the IDEA creates a cause of action *only* for individuals with disabilities.  Because Appellants assert that S.H. is not, and never was, a child with a disability, S.H. is excluded from the IDEA's provisions and may not bring a claim under that Act. (*See* Appellants Reply Br. 1 ("[The] School District . . . cannot avoid reality that S.H. is not a child with a disability and never was.").)  We cannot, sua sponte, create a cause of action where the plain language of a statute does not provide for one.[15]

---

[14] There is no "regarded as" language in the IDEA, which distinguishes it from the RA and the ADA, as discussed below.

[15] Appellants also rely on our decision in *Ferren C. v. School District of Philadelphia*, 612 F.3d 712, 719 (3d Cir. 2010), in

2.  <u>Legislative History</u>

Appellants argue that the plain language is not dispositive.  They claim that they can maintain a cause of action under the IDEA because, even though S.H. is not disabled, she is African-American and the IDEA should be construed to protect minority children who are misidentified as disabled.  In making this argument, Appellants ask us "simply to acknowledge the flip side of the 'identification' coin; that after a school district has, through the IDEA's procedures, misidentified an African-American child as having a disability, the child enjoys the same protections of the IDEA hearing process."  (Appellants Br. 17.)  In support of this proposition, Appellants point to language in the "Findings" section of the IDEA and to a House committee report prepared in anticipation of the IDEA's introduction, both of which acknowledge the problem of minority students being misidentified as disabled.[16]  Appellants contend that

---

which we held that a disabled young woman, who was 24 years old and not a "child," was still entitled to bring a claim under the IDEA.  Appellants reason that since we allowed this young woman, who is not a "child," to bring a claim, we should allow S.H., who is not "disabled," to bring a claim. (Appellants Reply Br. 11.)   This argument stretches our holding in *Ferren C.* beyond credulity.  We permitted the claim in *Ferren C.* because the harm to the young woman had occurred *while* she was a "child with a disability."  S.H. has never been a "child with a disability."

[16] The "Findings" section of the IDEA states:

> Greater efforts are needed to prevent the intensification of problems connected with

> mislabeling and high dropout rates among minority children with disabilities. More minority children continue to be served in special education than would be expected from the percentage of minority students in the general school population. African-American children are identified as having intellectual disabilities and emotional disturbance at rates greater than their White counterparts.

20 U.S.C. § 1400(c)(12)(A). Similarly, the relevant portion of the House committee report, issued by the House Committee on Education during its hearings on the IDEA, states:

> For minority students, misclassification or inappropriate placement in special education programs can have significant adverse consequences, particularly when these students are being removed from regular education settings and denied access to the core curriculum. Of particular concern is that, often, the more separate a program is from the general education setting, the more limited the curriculum and the greater the consequences to the student, particularly in terms of access to postsecondary education and employment opportunities. . . . Research shows that African Americans are nearly three times as likely to be identified as mentally retarded as their peers and nearly twice as likely to be labeled emotionally disturbed.

"Congress would have not expressed such concern about the misidentification of African-American children as disabled and then left those same children without any recourse under the IDEA." (Appellants Br. 19.)

Appellants' reliance on the statutory Findings and House committee report is unavailing. Legislative history has never been permitted to override the plain meaning of a statute. As the Supreme Court has made clear, "Congress' 'authoritative statement is the statutory text, not the legislative history.'" *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1980 (2011) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)). Legislative history may not be used to alter the plain meaning of a statute. "The law is what Congress enacts, not what its members say on the floor." *Szehinskyj v. Att'y Gen.*, 432 F.3d 253, 256 (3d Cir. 2005).

Moreover, "legislative history may be referenced only if the statutory language is written without a plain meaning, i.e., if the statutory language is ambiguous." *Byrd v. Shannon*, 715 F.3d 117, 123 (3d Cir. 2013). "Legislative history . . . is meant to clear up ambiguity, not create it." *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1267 (2011); *see also Velis v. Kardanis*, 949 F.2d 78, 81 (3d Cir. 1991) ("There is no need to resort to legislative history unless the statutory language is ambiguous."). We must "not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language." *Milner*, 131 S. Ct. at 1266; *see also Nat'l Coal. for Students with Disabilities Educ. &*

---

H.R. Rep. No. 108-77, at 98-99 (2003) (internal quotation marks omitted).

*Legal Def. Fund v. Allen*, 152 F.3d 283 (4th Cir. 1998) ("This plain meaning cannot be circumvented unless we have the rare instance when there is a clearly expressed congressional intent to the contrary or when a literal application of the plain language would frustrate the statute's purpose or lead to an absurd result."). Because there is no ambiguity in the IDEA's creation of a cause of action, we need not even look to legislative history.[17]

---

[17] In any case, contrary to Appellants' assertions, the legislative history does not evidence Congress's desire to create a *cause of action* for students who are misidentified as disabled. As the House committee report makes clear, Congress sought to remedy the problem of over-identification through the implementation of preventative and remedial policies and practices at the local level. *See* H.R. Rep. No. 108-77, at 98-99. Indeed, Congress enacted several provisions within the IDEA aimed at addressing this problem. *See, e.g.*, 20 U.S.C. § 1412(a)(24) (conditioning receipt of federal funds on the state's effectuation of "policies and procedures designed to prevent the inappropriate over[-]identification or disproportionate representation by race and ethnicity of children as children with disabilities"); *Id.* § 1416(a)(3)(C) (stating that the Secretary of Education has overall responsibility to oversee the states' obligations and responses as to "[d]isproportionate representation of racial and ethnic groups in special education" as a result of inappropriate identification).

3.  Child Find Provision

Appellants also argue that IDEA's "Child Find" requirement permits this lawsuit.   IDEA's "Child Find" provision states:

> All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A).  Appellants argue that, because the duty to identify children with disabilities falls squarely on schools, any parent should be able to bring a complaint to enforce this provision as this is clearly a "matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A).

Once again, Appellants' argument has no foothold in the plain language of the statute.  The Child Find provision, by its own language, imposes a duty on the school to create procedures by which to identify children with disabilities. However, the obligation of this duty is still only to "children with disabilities."   Appellants cannot escape the plain language of the IDEA.   Moreover, under the evidence presented, it is clear that the School District satisfied its duty

under the Child Find provision; the School District evaluated S.H. on numerous occasions in accordance with its internal policies, and S.H. was found to be eligible for special education.

Because the plain language of the statute only permits a child with a disability to bring a claim under the IDEA, S.H., who by her own admission is not disabled, cannot sustain her action.

B.      **Intentional Discrimination Under the RA and ADA**

Appellants also brought claims under § 504 of the RA and § 202 of the ADA.  Section 504 of the RA provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  Section 202 of the ADA similarly states:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Both the RA and ADA extend their protections not only to individuals who actually are disabled, but also to individuals who are "regarded as" having a disability. *See* 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1)(C). There is no dispute that S.H. was "regarded as" disabled by the School District, and therefore S.H. is not barred from bringing these claims.

The same standards govern both the RA and the ADA claims. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). To prevail on these claims, Appellants must demonstrate that S.H.: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability." *Id.* The District Court concluded that, because Appellants seek compensatory damages, they are required to make a showing of intentional discrimination to prevail on their claims. Appellants argue that no such showing is required. We have not yet spoken on this issue.

1. Statutory Language

Section 203 of the ADA states that the remedies available under § 202 of the ADA are the same remedies available under § 505 of the RA.[18] Similarly, § 505 of the RA clearly states that the remedies available under § 504 of the

---

[18] "The remedies, procedures, and rights set forth in [§ 505(a)(2) of the RA] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of [§ 202 of the ADA]." 42 U.S.C. § 12133.

RA shall be the same remedies available under Title VI of the Civil Rights Act of 1964.[19]  Based on this statutory language, the Supreme Court has observed that, "the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action under Title VI of the Civil Rights Act of 1964."[20]  *Barnes v. Gorman*, 536 U.S. 181, 185 (2002).  Plainly, therefore, Supreme Court precedent construing Title VI governs enforcement of the RA and the ADA as well.  *See Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) ("The ADA was modeled on the Rehabilitation Act, which had been modeled after Title VI, so it follows rationally that the rights and remedies afforded under both statutes should be governed by Title VI precedent.")  Thus, we must look to what Title VI, and the cases construing it, require for compensatory damages to determine the appropriate standard here.

---

[19] "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [§ 504 of the RA]."  29 U.S.C. § 794a(a)(2).

[20] That Congress intended to create identical remedies under Title VI, the RA, and ADA is hardly surprising given how closely the language of both the ADA and RA track Title VI. *Compare* 42 U.S.C. § 2000d, *with* 29 U.S.C. § 794, *and* 42 U.S.C. § 12132.

In *Guardians Association v. Civil Service Commission of New York*, the Supreme Court unequivocally held that private individuals who brought suit under Title VI could not recover compensatory relief in the absence of a showing of intentional discrimination.  463 U.S. 582, 597, 607 (1983); *see Alexander v. Sandoval*, 532 U.S. 275, 282-83 (2001) (restating *Guardian*'s holding that "private individuals [can] not recover compensatory damages under Title VI except for intentional discrimination").  We therefore take the next logical step and hold that claims for compensatory damages under § 504 of the RA and § 202 of the ADA also require a finding of intentional discrimination.

Appellants urge that our previous holding in *Ridgewood Board of Education v. N.E. ex rel. M.E.*, 172 F.3d 238 (3d Cir. 1999), suggests a different outcome.  In *Ridgewood*, parents of a disabled child brought claims against Ridgewood Board of Education, alleging that Ridgewood's failure to provide their son, M.E., with a free appropriate public education ("FAPE") constituted a violation of the IDEA, § 504 of the RA, 42 U.S.C. § 1983, and New Jersey state law, and seeking compensatory damages under 42 U.S.C. § 1983.  *Id.* at 245.  The District Court first found that Ridgewood had provided M.E. with a FAPE under the IDEA.  The District Court then granted summary judgment in Ridgewood's favor as to M.E.'s claim under § 504 of the RA.  *Id.* at 246.  Specifically, the District Court concluded that M.E.'s § 504 claim failed because M.E. had not demonstrated that he was "excluded from participation in, denied the benefits of, or subject to the discrimination at, the school."  *Id.*  On appeal, we reversed, finding that the evidence showed that Ridgewood had not provided M.E. with a FAPE.  We also concluded that summary judgment on the § 504 claim

had been improperly granted. We stated that while "a plaintiff must demonstrate that defendants know or should be reasonably expected to know of his disability," to establish a § 504 violation, "*a plaintiff need not prove that defendants' discrimination was intentional.*" *Id.* (emphasis added).

Ridgewood does not alter our analysis. Our statement in *Ridgewood*, that "a plaintiff need not prove that defendants' discrimination was intentional," referred only to *liability*, and not damages; it was intended to address the requirements for showing a *violation* of § 504, not the requirements for particular remedies. Our statement, thus, is inconsequential to whether a plaintiff seeking compensatory damages must allege intentional discrimination.[21]

We also note that our holding here is in line with our sister Circuits applying *Guardian*'s principles in the RA and the ADA context. All courts of appeals that have considered this issue have held that compensatory damages are not available under § 504 of the RA and § 202 of the ADA absent intentional discrimination. *See Meagley*, 639 F.3d at 389 ("All circuits to decide the question have held that to recover compensatory damages under either the ADA or the Rehabilitation Act, a plaintiff must establish that the agency's discrimination was intentional. . . . And they have all done so for good reason."); *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 603-04 (11th Cir. 2010); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d

---

[21] Even if we were to accept Appellants' view of our holding in *Ridgewood*, we would be forced to question its vitality following the Supreme Court's jurisprudence in *Barnes*, 536 U.S. 181, and *Sandoval*, 532 U.S. 275.

Cir. 2009); *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003) ("[P]rivate individuals may recover compensatory damages under § 504 . . . only for intentional discrimination."); *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination."); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999) (holding that a claim for compensatory damages under the RA "requires proof the defendant has intentionally discriminated against the plaintiff"); *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir. 1994) (acknowledging that recovery of damages under the RA requires a finding of intentional discrimination); *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 278 (7th Cir. 2007) (same).[22]

2. Standard for Intentional Discrimination

There have been two alternative standards suggested for intentional discrimination: discriminatory animus and deliberate indifference. Five of our sister courts have

---

[22] Appellants also argue that this Court should not require intentional discrimination because this Court has consistently rejected such standards in the IDEA compensatory remedy cases. *See M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996); *Carlisle Area Sch. Dist. v. Scott P. ex rel. Bess. P.*, 62 F.3d 520, 537 (3d Cir. 1995). This argument is inapposite as compensatory and punitive damages are not available under the IDEA. *See Chambers*, 587 F.3d at 185-86.

explicitly rejected discriminatory animus and held that deliberate indifference satisfies the requisite showing of intentional discrimination. *See Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012); *Meagley*, 639 F.3d at 389; *Loeffler*, 582 F.3d at 275; *Mark H.*, 513 F.3d at 938; *Powers*, 184 F.3d at 1153. These courts have generally applied a two-part standard for deliberate indifference, requiring both (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that likelihood." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001); *see also Loeffler*, 582 F.3d at 275 (holding that "intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom" (internal quotation marks and alterations omitted)); *Liese*, 701 F.3d at 344 (holding that under the more lenient standard of deliberate indifference, a plaintiff must prove that "'the defendant *knew* that harm to a federally protected right was substantially likely and [that the defendant] *failed* to act on that likelihood'" (quoting *T.W.*, 610 F.3d at 604)). Deliberate indifference "'does not require a showing of personal ill will or animosity toward the disabled person.'" *Meagley*, 639 F.3d at 389 (quoting *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009)); *see also Loeffler*, 582 F.3d at 275. However, "deliberate indifference must be a 'deliberate choice, rather than negligence or bureaucratic inaction.'" *Loeffler*, 582 F.3d at 276 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007).[23]

---

[23] This definition of deliberate indifference in the RA and the

Two courts of appeals have suggested that plaintiffs seeking compensatory damages must demonstrate a higher showing of intentional discrimination than deliberate indifference, such as discriminatory animus. *See Nieves-Marquez*, 353 F.3d at 126-27 (suggesting that discriminatory animus is the level of intent required) (citing *Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 290-91 (1st Cir. 1999)); *Delano-Pyle*, 302 F.3d at 575 (rejecting a deliberate indifference standard and adopting a higher showing for intentional discrimination) (citing *Carter v. Orleans Parish Pub. Schs.*, 725 F.2d 261, 264 (5th Cir. 1984)). To succeed under a discriminatory animus standard, a plaintiff must show "prejudice, spite or ill will." *Liese*, 701 F.3d at 344.

Which standard to apply — discriminatory animus or deliberate indifference — is a matter of first impression for our Court. We now follow in the footsteps of a majority of

---

ADA context is consistent with our standard of deliberate indifference in the context of § 1983 suits by prison inmates. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (holding that, in a § 1983 claim, deliberate indifference requires proof that the prison "'knows of and disregards an excessive risk to inmate health or safety'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The definition is also consistent with the Supreme Court's definition of deliberate indifference in the context of sexual harassment claims under Title IX. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (requiring "actual knowledge of discrimination in the recipient's programs and fail[ure] [to] adequately . . . respond").

our sister courts and hold that a showing of deliberate
indifference may satisfy a claim for compensatory damages
under § 504 of the RA and § 202 of the ADA. However, as
the Eleventh Circuit recently noted, despite the adoption of
the deliberate indifference standard by many of our sister
courts, "there has been little explication for the conclusion
that intentional discrimination under the RA may be
established by deliberate indifference." *Liese*, 701 F.3d at
345. We offer our explanation here and adopt many of the
same reasons provided by the Eleventh Circuit.

As an initial matter, the deliberate indifference
standard is better suited to the remedial goals of the RA and
the ADA than is the discriminatory animus alternative. In
discussing the enactment of the RA and the ADA, the
Supreme Court observed that "[d]iscrimination against the
handicapped was perceived by Congress to be most often the
product, not of invidious animus, but rather of
thoughtlessness and indifference — of benign neglect."
*Alexander v. Choate*, 469 U.S. 287, 295 (1985); *see also
Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944-45
(9th Cir. 2011) (applying *Choate*'s discussion of the
enactment of the RA to the ADA). Moreover, "[f]ederal
agencies and commentators on the plight of the handicapped
similarly have found that discrimination against the
handicapped is primarily the result of apathetic attitudes
rather than affirmative animus." *Alexander*, 469 U.S. at 296.
Consistent with these motivations, the RA and the ADA are
targeted to address "more subtle forms of discrimination"
than merely "obviously exclusionary conduct." *Chapman*,
631 F.3d at 945. Thus, a standard of deliberate indifference,
rather than one that targets animus, will give meaning to the
RA's and the ADA's purpose to end systematic neglect. *See*

*Choate*, 469 U.S. at 295 (noting that Senator Humphrey, who introduced the measure, stated that "we can no longer tolerate the invisibility of the handicapped in America" (quoting 118 Cong. Rec. 525-26 (1972))).

Moreover, the standard of deliberate indifference, while accommodating the RA's and the ADA's function in protecting the disabled, is also consistent with contract principles at play when legislation is passed via the Spending Clause. *See Liese*, 701 F.3d at 347. The RA and the ADA were enacted under Congress's Spending Clause power; legislation that is enacted under this power "is much in the nature of a contract" between the federal government and recipients of federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "Just as a valid contract requires offer and acceptance of its terms, 'the legitimacy of Congress' power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the contract.'" *Barnes*, 536 U.S. at 186 (alterations omitted) (quoting *Pennhurst*, 451 U.S. at 17). The Supreme Court has thus reasoned that a recipient of federal funding, such as the School District here, may be held liable for money damages only when it is on notice by statute that it has violated the law. *Id.* (discussing monetary damages under Title VI); *Gebser*, 524 U.S. at 287 (discussing monetary damages under Title IX).

Because the deliberate indifference standard requires knowledge, this standard satisfies contract law principles

while still protecting the disabled.[24]  As the Eleventh Circuit explained,

---

[24] We note that our conclusion today — that deliberate indifference is the standard for the requisite showing of intentional discrimination in RA and ADA actions — is reconcilable with our previous decision in *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548 (3d Cir. 2002). Relying on the Supreme Court's decision in *Sandoval*, *Pryor* held that plaintiffs challenging a policy of the National Collegiate Athletic Association ("NCAA") under Title VI could not satisfy the "intentional discrimination" requirement through evidence of disparate impact alone.  *Pryor*, 288 F.3d at 553 (addressing a challenge to a NCAA provision which raised the academic eligibility criteria for incoming student athletes that adversely affected black athletes); *see also Sandoval*, 532 U.S. at 278-79 (addressing a challenge to a state policy that required all drivers' license examinations to be administered in English with no aids or accommodations for individuals who spoke English as a second language, and that adversely affected individuals of foreign national origin). In reaching this conclusion, *Pryor* specifically rejected deliberate indifference as a viable theory.  *Pryor*, 288 F.3d at 568.  *Pryor* did so because it equated deliberate indifference with disparate impact.  *Id.* at 567.  In light of the Supreme Court's post-*Sandoval* jurisprudence, this was improper.  As this jurisprudence makes clear, deliberate indifference *is a form of* intentional discrimination, and not a pseudonym for disparate impact.  *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (recognizing that deliberate indifference is a form of intentional discrimination).  Despite this mislabeling of deliberate indifference, *Pryor*'s holding

34

> The deliberate indifference standard best reflects the purposes of § 504 while unambiguously providing the notice-and-opportunity requirements of Spending Clause legislation. A lower standard would fail to provide the notice-and-opportunity

that the mere fact of disparate impact is insufficient to sustain a Title VI challenge to a facially neutral policy remains good law.

*Pryor* is inapplicable to our situation here. In cases involving action (or inaction) toward an individual that results in a violation of rights, such as we have here, the Supreme Court has readily accepted that deliberate indifference can create a viable cause of action. *See Gebser*, 524 U.S. at 290-91 (finding that the school district may be liable under the standard of deliberate indifference where a teacher sexually harassed a student); *Davis v. Monroe Cnty.*, 526 U.S. 629, 643 (1999) (same where a student sexually harassed another student); *see also Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 692-93 (6th Cir. 2000) (recognizing that the Supreme Court's jurisprudence on deliberate indifference in the sexual harassment context is not easily transferrable to challenges to facially neutral policies).

Thus, to the extent that *Pryor* equated deliberate indifference with disparate impact, that holding cannot stand. To the extent that *Pryor* addressed the requisite showing of intentional discrimination for challenges to facially neutral policies with disparate impacts, we offer no comment.

requirements to RA defendants, while a higher
standard—requiring discriminatory animus—
would run counter to congressional intent as it
would inhibit § 504's ability to reach knowing
discrimination in the absence of animus.

*Liese*, 701 F.3d. at 348.

## C.    <u>Grant of Summary Judgment</u>

We now turn to the merits of the appeal: whether there
is evidence in the summary judgment record that creates a
genuine factual dispute as to whether the School District was
deliberately indifferent toward S.H. by mislabeling her as a
disabled student.    To satisfy the deliberate indifference
standard, Appellants must present evidence that shows both:
(1) *knowledge* that a federally protected right is substantially
likely to be violated (i.e., knowledge that S.H. was likely not
disabled and therefore should not have been in special
education), and (2) *failure to act* despite that knowledge.  *See
Duvall*, 260 F.3d at 1139.

Appellants argue that the School District had
knowledge that S.H. had likely been misidentified for several
reasons: (1) S.H. told her teachers in fifth grade and middle
school that she did not think she belonged in special
education; (2) S.H. protested her placement in special
education in tenth grade by refusing to attend speech therapy;
(3) within three months of S.H.'s misidentification as a
disabled student, S.H.'s reading scores surpassed the fifth-
grade level; (4) S.H.'s scores on standardized tests continued
to show that S.H. tested at or around grade level; (5) S.H.
continued to do well in school, making Honor Roll in seventh
and eighth grade; and (6) the evaluations of three separate

psychologists, including Dr. Abdullah-Johnson, revealed that S.H. was not disabled. We find these reasons unpersuasive to create a genuine factual dispute as to knowledge.

To begin, we are unpersuaded by Appellants' reliance on S.H.'s testimony that she expressed unhappiness at being designated disabled in fifth grade (when she was ten years old) and later also told her seventh-grade teacher that she did not feel like she belonged in ISL classes. S.H.'s subjective complaints about being put in special education classes put the School District on notice of nothing more than the fact that S.H. did not like being in special education classes. More importantly, Ms. Durrell, despite S.H.'s feelings, continued to approve her placement in special education. Where the parent agrees with, and gives informed consent to, a child's placement in special education, a child's feelings to the contrary can hardly constitute "notice." For similar reasons, we cannot say that S.H.'s testimony that she told her IEP team that she hated going to speech therapy creates a genuine dispute of material fact as to the School District's knowledge.

Appellants' contention that the evaluations by the three psychologists put the School District on notice is also to no avail. Dr. Abdullah-Johnson performed his evaluation in 2010. The other two evaluations, those of Dr. Jones and Dr. Rosenberg, were submitted in preparation for this lawsuit in 2012, more than two years after S.H. had been removed from special education.[25] These reports only evidence the School

---

[25] Dr. Jones conducted her evaluation of S.H. in December 2011, and Dr. Rosenberg conducted his evaluation in January 2012.

District's knowledge *subsequent* to their publication; nothing in the reports can be said to create a genuine dispute as to the School District's knowledge at the time it designated S.H. as having a learning disability (i.e. from 2004 through 2009).

Moreover, liability in this case is not dependent merely on whether the School District's psychologists erred in their determinations. The relevant inquiry is knowledge, and evidence that the School District may have been wrong about S.H.'s diagnosis is not evidence that the School District had *knowledge* that it was a wrong diagnosis. Nor does evidence that the School District's evaluation processes were defective bear on our analysis.[26] Additionally, we cannot say that the School District failed to act on this knowledge, as the School District immediately exited S.H. from special education

---

[26] Appellants allege that Ms. Cucinotta's and Dr. Cosden's evaluations were defective for using the predicted achievement method, failing to consider S.H.'s familial circumstances and personal tragedies, and failing to consider all of S.H.'s test scores. However, evidence that the School District would have, or should have, known that S.H. was not disabled had the evaluations been free of defects, is insufficient. Deliberate indifference requires *actual knowledge*; allegations that one would have or "should have known" will not satisfy the knowledge prong of deliberate indifference. *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (holding that, under the deliberate indifference standard, "[i]t is not sufficient that the official *should have known* of the risk" (emphasis added)). As such, we will not consider the allegedly defective evaluations as part of the knowledge analysis.

following Dr. Abdullah-Johnson's evaluation and upon Ms. Durrell's request.

Appellants' best argument as to knowledge is that S.H.'s test scores and good grades in school should have put the School District on notice that she did not have a learning disability. Ultimately, this evidence is insufficient as well. As an initial matter, S.H.'s test scores, when taken as a whole, are not conclusive. While S.H. performed well in some areas on various tests throughout her educational career, she performed below average in other areas. For example, when S.H. was in seventh grade, S.H. scored at a 7.4 grade-level in vocabulary on the Stanford Diagnostic Reading Test, but scored at a 5.3 grade-level in comprehension and at a 4.1 grade-level in "scanning." (App. 624.) Similarly, in eighth grade, S.H. performed at the "advanced" level in reading and "proficient" level in writing on the PSSA, but performed "below basic" in both math and science. (App. 625, 658.) Additionally, Appellants have offered no evidence that high test scores are an indication that a student likely does not have a learning disability, nor have they offered evidence that children in special education usually do not receive good grades.

Put simply, Appellants have presented no evidence that would create a genuine dispute as to whether the School District knew, prior to Dr. Abdullah-Johnson's evaluation, that S.H. had likely been misidentified as having a learning disability. Thus, we need not explore the second prong of the

deliberate indifference test, i.e., whether the School District failed to act.[27]

---

[27] Appellants also seem to suggest that the School District was on notice that it had likely misidentified S.H. because it was aware of the pervasive problem of over-identifying minority children as disabled in general. In support of this argument, Appellants point to: (1) the IDEA's statutory warnings about over-identification; (2) a 2006 self-assessment conducted by the School District that revealed that over-identification was occurring within the district; and (3) the deposition testimony from Assistant Superintendent Michael Kelly, who acknowledged awareness that a disproportionate number of African-American students were in special education compared to their representation in the student body. This position is untenable.

While the "Findings" section of the IDEA, 20 U.S.C. §§ 1400(c)(12)(A)-(E), does in fact suggest that over-identification of minority children is a pressing concern, we fail to see the logic that this brief warning in a national law should put a local school district on notice of anything. Furthermore, as the 2006 self-assessment is not in the record before us, we may not consider it. Even if we were to consider it, the evidence to be gleaned from the 2006 self-assessment is far more limited than Appellants are willing to acknowledge. The 2006 self-assessment did *not* put the School District on notice of over-identification specifically; at most, the 2006 self-assessment merely put the School District on notice that "there was a disproportionate number of African-American students in special education programs in Lower Merion." *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749, 757 (E.D. Pa. 2011) (discussing the contents of

## IV.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's orders.

---

the 2006 self-assessment evaluation which noted that African-Americans constituted 7.7% of the student body and 12.7% of the students in special education).  Thus, the 2006 self-assessment evidences only that the School District knew that a disproportionate number of African-American students were enrolled in special education, a fact that Mr. Kelly testified to as well.  We cannot infer from this that the School District knew that S.H. *in particular* had been misidentified. Such an argument is too attenuated to stand.